**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| LOUIS ZHAO, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | **Case No. 1:23-CV-03346-GHW** |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| EQONEX LIMITED, BINANCE GROUP, BIFINITY UAB, JONATHAN FARNELL, DANIEL LING, ALMIRA CEMMELL, YU HELEN HAI, and ZHAO CHANGPENG, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

1.      Lead Plaintiff Bin Li and named plaintiffs Kreig Kinnaman[1] and Jaime Chaves[2] ("Plaintiffs"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys that included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, wire, press releases, and analyst reports published by and regarding non-party defendant Eqonex Limited ("Eqonex" or "Company") and Defendants Bifinity UAB

---

[1] Mr. Kinnaman's PSLRA certification, attesting that he is willing to serve as representative of the class and remains willing to provide testimony at deposition and trial, if necessary, is attached hereto as Exhibit 1.

[2] Mr. Chaves's PSLRA certification, attesting that he is willing to serve as representative of the class and remains willing to provide testimony at deposition and trial, if necessary, is attached hereto as Exhibit 2.

("Bifinity") and Binance Group ("Binance"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.    This is a federal securities class action on behalf of a class ("Class") consisting of all persons other than defendants who purchased or otherwise acquired Eqonex common stock on the NASDAQ market between March 7, 2022 and November 21, 2022, inclusive ("Class Period"), against Binance,  Bifinity, Jonathan Farnell ("Farnell"), Daniel Ling ("Ling"), Almira Cemmell ("Cemmell"), Yu Helen Hai ("Hai"), and Zhao Changpeng ("Changpeng") (collectively, "Defendants"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.    Defendants took control of Eqonex to circumvent a ban on Binance engaging in regulated activity in the United Kingdom ("U.K.") in exchange for a $36 million loan. After Defendants assumed control, the Company lied to investors, materially misleading them that Bifinity and/or Binance and Eqonex would merge. The Company also lied about the loan sufficing to stave off Eqonex's insolvency. In direct response to Eqonex's disclosing the truth, the Company's stock price fell, materially damaging Plaintiffs and the Class.

4.    At the beginning of the Class Period, Eqonex (formerly Diginex Limited) was a Singapore- domiciled digital assets financial services company that operated four business lines: Custody, Asset Management, Brokerage, and the Eqonex Exchange (the "Exchange").

5.    Eqonex's Custody business was comprised of Digivault, a stand-alone digital asset custodian based in the U.K. Its Asset Management business was made up of Bletchley Park, a

fund of hedge funds operating in Switzerland, and Eqonex Investment Products, which issued publicly placed exchange-traded products listed on globally recognized exchanges. The Brokerage business was made up of Eqonex OTC, an over-the-counter brokerage business operating from Hong Kong and Singapore, Eqonex Lending, a borrowing and lending business, and Eqonex Structured Products, which offered bespoke private placements against underlying crypto assets. The Exchange business offered the trading of Virtual Currencies and their respective derivatives, and facilitated the trading of products in BTC, ETH, BCH, USDC, USDT, and Eqonex's alleged utility token known as EQO ("EQO Token" or "Token"), through what Eqonex described as a "compliant, secure, fair, and equitable platform."

6.     On March 7, 2022, Eqonex announced that it had entered into a "strategic partnership" with Bifinity, a payments technology company affiliated with Binance that launched the same day. In its press release announcing the partnership, Eqonex stated that the strategic partnership would initially focus on leveraging Digivault as a U.K. Financial Conduct Authority ("FCA") regulated custodian and strengthening the technology supporting the EQONEX Exchange. It would also focus on expennding Bifinity's geographical footprint through EQONEX's licensing framework. Eqonex also disclosed that Bifinity had been powering Binance's fiat-to-crypto on and off-ramps since 2021, processing millions in transactions globally. Bifinity is wholly controlled by Defendant Changpeng, its sole shareholder. Eqonex stated that in the long run, it and Bifinity would continue to engage in discussions to explore potential merger opportunities.

7.     Under the partnership, Bifinity issued Eqonex a $36 million convertible loan facility ("Loan") in exchange for a right to appoint the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Chief Legal Officer ("CLO") of Eqonex, as well as nominate two

members for Eqonex's board. In other words, the strategic partnership put Bifinity (and, through Bifinity, Binance) in control of Eqonex by taking over its executive management.

8.    As a result of the strategic partnership, Bifinity acquired specific contractual rights over Eqonex as the parent company of Digivault that the U.K.'s Financial Conduct Authority ("FCA") regulates under the U.K.'s money-laundering regulations ("MLRs"). Under the Transaction Security Document that was part of the loan agreement, Eqonex granted Bifinity over 24.9% of the shares of Digivault. As a result, Bifinity, and, through Bifinity, individuals and entities that were part of Binance, became beneficial owners of Digivault for the purposes of the MLRs. An August 2022 amendment to the MLRs clarified that the FCA would consider assignment of more than 24.9% of the shares of Digivault to Bifinity as a change in control transaction.

9.    Less than two weeks after the announcement of the strategic partnership, the board of directors of Eqonex ("Board") appointed Bifinity's nominees for CEO (Defendant Farnell), CFO (Defendant Ling), and Chief Corporate Affairs Officer (Defendant Cemmell) (in lieu of a CLO) of Eqonex. Pursuant to the terms of the Loan agreement, Eqonex's Board also appointed Farnell and Defendant Hai, who was shortly after replaced by Ling, as Board members. These Defendants continued to also serve in key management roles in Binance and/or Bifinity. Under the terms of the strategic partnership, they were compensated for their work at Eqonex by Bifinity.

10.   Unbeknownst to Eqonex investors, however, the "strategic partnership" was a ruse. Defendants had no intention of actually consummating a merger between Eqonex and Binance or Bifinity. Rather, Bifinity was developing a custody solution which was very similar to Digivault, but the U.K. FCA had banned Binance from undertaking any regulated activity in the UK. The strategic partnership was a way for Binance to evade this ban. More, the Loan was not sufficient to stave off Eqonex's insolvency, and Eqonex had no way to pay it back in the requisite time frame.

11.     As the Class Period continued, Eqonex investors knew only that Eqonex's business revenue remained low and its cash position worsened. Then, on August 15, 2022, Eqonex announced that it planned to exit the crypto exchange space, close the Exchange, and focus its resources on its Asset Management and Custody businesses. Despite the Exchange accounting for 79.9% of Eqonex's revenues in the financial year ending March 31, 2022, Defendant Farnell assured investors that, "[w]e have conviction that proactively exiting the crowded exchange space is the right decision to deliver shareholder value" and that "[o]ur Asset Management and Custody business, Digivault, have already made solid progress with the additional resources that we have allocated to them recently, and we are bullish about their prospects as we become an organization focused on these high- potential business areas." In a press release issued by Eqonex, Defendants assured investors that doing so would "improve the Company's financial position."

12.     That same day, in connection with the closure of the Exchange and in accordance with the Loan agreement, Bifinity granted Eqonex a waiver for the cessation of a major business and Eqonex agreed to increase Bifinity's share charge of Digivault under the loan agreement from 24.9% to 100%. In other words, Bifinity took over Digivault entirely as Eqonex lost the source of nearly 80% of its revenue.

13.     On this news, Eqonex's share price fell over 18% to close at $0.637 on August 17, 2022, on unusually heavy trading volume.

14.     Then, on November 21, 2022, Eqonex disclosed that it was "currently in breach of certain provisions of the Loan Agreement and consequently seeking a waiver from Bifinity on such breaches" and "[b]ased on the working capital forecast prepared by management of the [Company], the financial resources available to the [Company] as of March 31, 2022 and up to [November 21, 2022] may not be sufficient to satisfy the working capital requirements of the

[Company] for a period of twelve months from th[at] date … which *may cast significant doubt on the Group's ability to continue as a going concern*."

15.     On this news, Eqonex's share price plummeted over 48% to close at $0.141 on November 22, 2022, on unusually heavy trading volume.

16.     Before markets opened on November 29, 2022, Eqonex announced receipt of The Nasdaq Stock Market LLC ("NASDAQ")'s Listing Qualifications department's determination that Eqonex securities would be delisted from NASDAQ and that trading in its stock would be suspended at the opening of business on November 30, 2022.

17.     On this news, Eqonex's share price fell over 34% to close at $0.093 on November 29, 2022, on unusually heavy trading volume.

18.     Throughout the Class Period, Defendants materially misled investors, most critically by hiding the true reason for the strategic partnership and failing to disclose that Eqonex had on way to pay Bifinity back for the Loan and that there were no plans to work towards a merger between Eqonex and Binance or Bifinity.

19.     As a result of these violations, Plaintiffs and other members of the Classes have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act (15 U.S.C. § 78aa).

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), § 27 of

the Exchange Act (15 U.S.C. § 78aa(c)).

23.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24.    Plaintiffs purchased or otherwise acquired Eqonex stock during the Class Period.

25.    Eqonex is a non-party defendant. Eqonex has filed for judicial management pursuant to the Insolvency, Restructuring and Dissolution Act 2018 of Singapore. Eqonex is a primary violator for the false statements alleged herein. Given the Company's insolvency, Plaintiffs are proceeding with this action against the remaining Defendants. During the Class Period, Eqonex stock traded on the NASDAQ stock market under the ticker symbol "EQOS."

26.    Defendant Binance is the world's leading blockchain ecosystem and cryptocurrency infrastructure provider.

27.    Defendant Bifinity is a payments technology company, incorporated in the Republic of Lithuania, that is part of Binance as its official fiat-to-crypto payments provider. Binance launched Bifinity on March 7, 2022, the same day that Eqonex announced the strategic partnership" with Bifinity.

28.    Defendant Farnell became the CEO and a director of Eqonex on March 17, 2022. He is also the head of Binance for the U.K. and the CEO of Bifinity.

29.    Defendant Ling became CFO and a director of Eqonex on April 28, 2022. He also serves as Bifinity's Director of Strategy.

30.    Defendant Cemmell was appointed Chief Corporate Affairs Officer of Eqonex on

March 31, 2022. Prior to that role, Cemmell was Special Projects Lead for Bifinity, where she was responsible for process improvements, project coordination, and the development of new strategic partnerships.

31.     Defendant Yu Helen Hai was appointed a director of Eqonex on March 17, 2022. She resigned from the Board on April 28, 2022, and replaced by Ling. She is the president of Bifinity as well as the head of the NFT and fan token platforms of Binance and the Binance Charity Foundation.

32.     Defendant Zhao Changpeng, the sole shareholder of Bifinity, is the co-founder and CEO of Binance.

33.     Defendants Farnell, Ling, Cemmell, and Hai are referred to herein as the "Eqonex Individual Defendants," and, with Defendant Changpeng, the "Individual Defendants."

34.     The Eqonex Individual Defendants possessed the power and authority to control the contents of Eqonex's SEC filings, press releases, and other market communications. The Eqonex Individual Defendants were provided with copies of the Eqonex's SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Eqonex, Binance, and/or Bifinity, and their access to material information available to them but not to the public, the Eqonex Individual Defendants knew or should have known that Eqonex was making material misrepresentations and omissions to investors.

35.     The Individual Defendants, Binance, and Bifinity are referred to herein collectively as the Defendants.

## SUBSTANTIVE ALLEGATIONS

### *Eqonex Background*

36.      Eqonex, f/k/a Diginex, was listed via a Special Purpose Acquisition Company ("SPAC") on NASDAQ on October 1, 2020. At the time, Forbes described Diginex as "The First Crypto and Digital Asset Exchange To Go Public In The U.S." As the first firm with a crypto exchange to go public, Diginex stood out in the market as a company that could raise transparency and compliance standards in a field often marked by troubled relationships with financial regulators. Richard Byworth, the CEO of Diginex at the time, touted the company as one that would "help raise standards and the transparency of the industry in order to help it grow."

37.      In March 2022, as the Class Period began, Eqonex was a digital assets financial company which operated four business lines: Custody, Asset Management, Brokerage, and the Exchange.

38.      Eqonex's Custody business was composed of Digivault, which was an institutionally focused, secure digital asset custodian. Digivault offered storage solutions for digital assets and targets, primarily for institutional clients. In May 2021, Digivault had received approval from the FCA to register as a custodian wallet provider under the Money Laundering, Terrorist Financing and Transfer of Funds (Information of the Payer) Regulations 2017 (MLR 2017), as amended by the Money Laundering and Terrorist Financing (Amendment) Regulations 2019.

39.      Eqonex's Asset Management business was comprised of Bletchley Park, a fund of hedge funds operating in Switzerland, and Eqonex Investment Products, which issued publicly placed exchange-traded products listed on globally recognized exchanges.

40.      Eqonex's Brokerage business was made up of Eqonex OTC, an over-the-counter brokerage business operating from Hong Kong and Singapore, Eqonex Lending, a borrowing and

lending business, and Eqonex Structured Products, a business set to launch in the second half of 2022 to offer bespoke private placements against underlying crypto assets.

41.    Eqonex's Exchange business offered the trading of virtual currencies and their respective derivatives, and facilitated the trading of products in BTC, ETH, BCH, USDC, USDT and EQONEX's utility token, EQO. The Exchange operated under an exemption to provide payment services pursuant to the Payment Services (Exemption for Specified Period) Regulations 2019 granted by the Monetary Authority of Singapore.

### Binance and Bifinity Background

42.    Binance, founded in 2017, is an online exchange where users can trade cryptocurrencies. It operates the largest bitcoin exchange and altcoin crypto exchange in the world by volume.

43.    Binance Custody, launched in December 2021, features sophisticated storage security and liquidity solutions for institutions to manage digital assets.

44.    Bifinity, which launched on March 7, 2022, engages in the provision of cryptocurrency-related services, including services for the conversion of fiat currencies into cryptocurrencies and vice versa, operation of digital wallets, and currency custody and storage services. Bifinity is part of Binance, acting as Binance's official fiat-to-crypto payments provider.

45.    On June 26, 2021, the FCA ordered Binance to stop all regulated activity in the U.K. over worries about weak consumer protections, amid a wider crackdown on the cryptocurrency industry's potential role in fraud and money laundering. Some of the U.K.'s largest banks, including Santander and Barclays, also acted, barring customers from sending money to the Binance exchange.

46.    The FCA order was one of several regulatory actions against Binance. Also in June

2021, Japan's Financial Services Agency, that country's financial regulator, warned consumers that Binance was not registered to do business in Japan and was operating there without permission. In August 2021, Binance said it would restrict Hong Kong users from trading derivative products, in response to regulator pressure there. In April 2021, German's financial watchdog, the Federal Financial Supervisory Authority, warned investors that Binance may have violated securities rules by allowing non-US users to trade tokenized versions of some US stocks by failing to issue a prospectus detailing its offering of the assets. Then, in June 2023, the SEC sued Binance and Defendant Changpeng personally, alleging that for years, the company had acted in "blatant disregard" of US securities laws. The charges included operating unregistered exchanges, broker-dealers, and clearing agencies, misrepresenting trading controls and oversight on the Binance.US platform, and the unregistered offer and sale of securities.

***Materially False and Misleading Statements***

47.     On March 7, 2022, before markets opened, Eqonex issued a press release announcing that it had entered into a strategic partnership with Bifinity. Under the terms of the strategic partnership, Bifinity would advance a $36 million convertible loan to Eqonex. The Company's press release touted that the companies would "work together to maximize business synergies created by this new strategic relationship and capitalize on opportunities to cooperate and further expand their business."

48.     The press release disclosed that the partnership would "initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the EQONEX Exchange, and expanding Bifinity's geographical footprint through EQONEX's licensing framework." It also told investors that both companies would "continue to engage in non-

binding discussions to explore potential merger opportunities, subject to regulatory approval." Defendant Hai commented that Eqonex's "institutional approach and ability to utilize global regulatory frameworks to build a compliant business directly complements our retail focus and will greatly benefit Bifinity over the long-term."

49.     Eqonex further disclosed that Bifinity would have the right to appoint, from within Bifinity, the Chief Executive Officer, Chief Financial Officer, and Chief Legal Officer of EQONEX as well as nominate two seats on EQONEX's Board of Directors.

50.     The foregoing statement was materially false and misleading because it materially misled investors concerning the partnership between Eqonex and Bifinity. Specifically, Defendants, who had taken control of Eqonex, knew or recklessly disregarded and omitted that: (1) Eqonex had no way to repay Bifinity pursuant to the terms of the Loan Agreement; and (2) Defendants did not intend to consummate a merger between Eqonex and Bifinity (or Binance). More, it left out critical context: that Defendants' actual plans to "leverage[e] Digivault as an FCA regulated custodian" and "expand[] Bifinity's geographical footprint through EQONEX's licensing framework" were to get around the FCA's ban on Binance undertaking any regulated activity in the U.K.

51.     On this news, Eqonex's share price increased over 22%, from a closing price of $1.46 on March 4, 2022 to a $1.79 closing price on March 9, 2022.

52.     On March 7, 2022, the FCA issued a statement concerning the partnership between Eqonex and Bifinity, expressing concern. The FCA stated that it was aware of statements by Eqonex and Binance confirming that a member of the Binance group called Bifinity would advance a $36 million loan to Eqonex. It stated that the FCA did not have powers to assess the fitness and propriety of the new beneficial owners or the change in control before the transaction

was completed, and reiterated that it had previously published information expressing concerns about Binance and banned it from undertaking regulated activities without written consent of the FCA. The FCA noted that "[t]his requirement was put in place because, in the FCA's view, Binance Markets is not capable of being effectively supervised."

53.    Then, on March 17, 2022, the Company issued a press release announcing that it and Bifinity "took the next step in solidifying their strategic partnership with the appointment of EQONEX's new CEO and two new members to the EQONEX Board of Directors (the "Board")." Defendant Farnell, also the head of Binance for the U.K. and the CEO of Bifinity, became the CEO on Eqonex. Defendant Ling, also Bifinity's Director of Strategy, became CFO. Defendant Cemmell, Special Projects Lead for Bifinity, became Chief Corporate Affairs Officer. Additionally, Farnell and Defendant Hai, the president of Bifinity as well as the head of the NFT and fan token platforms of Binance and the Binance Charity Foundation, joined the Eqonex board of directors.[3] That press release continued, in relevant part:

> As CEO, Jonathan will play an instrumental role in ***fast-tracking the collaboration between both businesses***. The initial phase of this groundbreaking strategic partnership will put in place a framework for Bifinity to safeguard some of its client assets with EQONEX's FCA registered custodian, Digivault, in compliance with all applicable regulatory requirements. Moving forward, ***Bifinity will develop ways to leverage the EQONEX Exchange as an alternative trading platform, deploy resources to strengthen the technology***, and also explore opportunities to scale the asset management business.

(Emphasis added.) Farnell commented that Digivault, Eqonex's Eqonex's Asset Management business, and the Exchange created an "opportunity to create a full ecosystem by harnessing Bifinity's technology, marketing clout and client base," which would "[have] the potential to be transformative for the industry." He added that he was "looking forward to fostering true

---

[3] Hai was replaced on the Board on April 28, 2022 by Ling.

collaboration and productivity across both businesses across both teams."

54.     The foregoing statement was materially false and misleading because it materially misled investors concerning the partnership between Eqonex and Bifinity. Defendants knew or recklessly disregarded but omitted that the "collaboration" between Eqonex and Bifinity was simply an attempted end-run around the FCA's ban on Binance undertaking any regulated activity in the U.K.

55.     On this news, Eqonex's share price increased over 32%, from an open of $1.62 on March 17, 2022 to a close of $2.15 on March 21, 2022.

56.     The partnership with Bifinity provided additional assurance to Eqonex investors concerning the Company's well-being. For example, in a June 3, 2022, analyst report, Brian Dobson and Greg Pendy of Chardan Research issued a report that noted that "[i]n our view, the company's strategic partnership with Bifinity, a division of Binance, limits potential downside."

57.     In August 2022, the FCA announced that as of August 11, it had expanded its change in control regime to include FCA-registered cryptoasset businesses. From August 11, 2022, a person or entity wishing to acquire "control" of a FCA-registered cryptoasset business, directly or indirectly, would have to receive prior FCA approval. A failure to do so would be a criminal offense. This obligation arose through the new Regulation 60B and Schedule 6B to the UK's Money Laundering Regulations (MLRs), which apply Part 12 of the Financial Services and Markets Act 2000 (FSMA) to cryptoasset businesses, with some modifications. Under the new regime, the FCA would undertake a 'fit and proper' assessment of the proposed controller, as well as the power to object to the transaction and to make its reasons for objecting public. A "controller" would mean a person or entity who owns more than 25% of the shares or voting rights in the crypto business.

58.     This change was not a surprise. It was initially laid as a draft statutory instrument in the U.K. Parliament on June 15, 2022, but had already been anticipated in the industry. Accordingly, Defendants knew at the time that they entered into the strategic partnership that under U.K. law, it would mean a change in control for Digivault, and Eqonex and Bifinity would ultimately have to obtain clearance for the arrangement.

**The Truth Emerges**

59.     On August 15, 2022, the Company issued a press release announcing, in relevant part, that:

> [Eqonex] is taking decisive action to streamline its operations and focus resources primarily on the businesses that offer the most potential for revenue growth and long-term financial sustainability: Asset Management and Custody. The Company will proactively exit the crowded crypto exchange space by closing the Exchange.
>
> EQONEX Chairman Chi-Won Yoon recently outlined the Company's strategic priorities and intention to focus its resources on businesses where it has significant competitive strengths and can leverage its traditional finance expertise and experience. The decision by the EQONEX Board of Directors to accelerate its strategic plan and close the Exchange is in alignment with this strategic framework.
>
> Closing the Exchange will improve the Company's financial position by materially reducing the high-cost structure associated with operating the Exchange, and free up resources to drive growth in the segments where it has significant competitive strengths.
>
> EQONEX CEO Jonathan Farnell said, "We are focused on opportunities that will drive revenue growth and position us for long-term success. Closing the Exchange will significantly simplify our business, narrow our focus, free up resources, and allow us to operate as a more efficient organization with capacity to aggressively go after market segments that offer the most potential. … We take a realistic view that our exchange will not move the needle for us financially over the near-to- medium term. We don't see value in continuing to bear the costs of operating an exchange during what may be a prolonged market downturn. We have conviction that proactively exiting the crowded exchange space is the right decision to deliver shareholder value."
>
> "Our Asset Management and Custody business, Digivault, have already made solid progress with the additional resources that we have allocated to them recently, and we are bullish about their prospects as we become an organization focused on these high-potential business areas."

15

60.     On this news, Eqonex's share price fell over 18% to close at $0.637 on August 17, 2022, on unusually heavy trading volume.

61.     Even though Eqonex was closing its Exchange, which had accounted for 79.9% of its revenues in the financial year ending March 31, 2022, Defendants assured investors that doing so would "improve the Company's financial position" and was "the right decision to deliver shareholder value" in order for resources to be allocated to the "high-potential" Asset Management and Custody businesses.

62.     But during trading hours on November 21, 2022, the Company disclosed that:

Subsequent to March 31, 2022, the end of the reporting period of the Singapore statutory financial statements, the Group is currently in breach of certain provisions of the Loan Agreement and consequently seeking a waiver from Bifinity on such breaches. … Based on the working capital forecast prepared by management of the Group, the financial resources available to the Group as of March 31, 2022 and up to the date of this Form-6-K may not be sufficient to satisfy the working capital requirements of the Group for a period of twelve months from the date of this 6-K, which may cast significant doubt on the Group's ability to continue as a going concern.

63.     On this news, Eqonex's share price plummeted over 48% to close at $0.141 on November 22, 2022, on unusually heavy trading volume.

*Additional Scienter Allegations*

64.     Binance and its executives have consistently acted to subvert financial regulators. For example, in March 2023, CNBC reported that between 2021 and 2023, Binance ran a Discord server and a Telegram group in which Binance employees and Binance-trained volunteers shared techniques with users in China to evade Binance's "Know Your Customer," residency and verification systems in order to trade cryptocurrency in violation of a 2021 ban by China.

65.     Similarly, the SEC alleged in its lawsuit against Binance and Defendant Changpeng that for year, Binance encouraged certain US-based customers to submit false Know

Your Customer information so that it could operate as an unlicensed securities exchange in the US.

66.    When Binance was banned from regulated activity in the U.K., its executives took the same action they did every time a financial regulator imposed any kind of restriction on it: finding ways to undermine rather than comply with the FCA. In fact, they pursued access to U.K. markets in more than one way. In February 2022, Binance entered a partnership with the FCA-approved, London-based payments provider Paysafe, which created the potential for Binance users to deposit sterling via Paysafe through its Faster Payments Service. At the time, the FCA reiterated its concerns about Binance, but stated it had limited powers to object to the arrangement with Paysafe.

67.    They also did this by taking control of Eqonex in exchange for $36 million, which Defendants called a loan to investors but knew or recklessly disregarded that Eqonex was not in a position to repay. More, Defendants knowingly or recklessly misled investors by describing the strategic partnership with Eqonex as a possible precursor to a merger, when their actual plan was to simply use Eqonex and Digivault to get around the FCA's restrictions.

***Loss Causation***

68.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

69.    During the Class Period, Plaintiffs and the other members of the Class purchased Eqonex stock at artificially inflated prices and were damaged thereby. The price of Eqonex stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing these investors' losses.

*Reliance Presumption*

70.    The market for Eqonex's stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Eqonex's stock traded at artificially inflated prices during the Class Period. On March 24, 2022, Eqonex's share price closed at a Class Period high of $2.58 per share. Plaintiffs and other Class members purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of Eqonex's stock and market information relating to Eqonex, and have been damaged thereby.

71.    During the Class Period, Defendants' material misrepresentations and/or omissions concerning Eqonex caused the artificial inflation of Eqonex's shares, causing the damages sustained by Plaintiffs and other Class members. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other Class members purchasing Eqonex's stock at such artificially inflated prices, and each of them has been damaged as a result.

72.    At all relevant times, the market for Eqonex's stock was an efficient market for the following reasons, among others:

  a.  Eqonex shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market.

  b.  As a regulated issuer, Eqonex filed periodic public reports with the SEC and/or the NASDAQ.

  c.  Eqonex regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or Eqonex was followed by securities analysts employed by brokerage firms who wrote reports about Eqonex, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

d.  Eqonex's stock price responded timely to new news concerning the Company.

e.  At the beginning of the Class Period, Eqonex's market capitalization exceeded $70 million.

73.    As a result of the foregoing, the market for Eqonex's stock promptly digested current information regarding Eqonex from all publicly available sources and reflected such information in Eqonex's share price. Under these circumstances, all purchasers of Eqonex's stock during the Class Period suffered similar injury through their purchase of Eqonex's stock at artificially inflated prices and a presumption of reliance applies.

74.    Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## CLASS ACTION ALLEGATIONS

75.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of Eqonex during the Class Period. Excluded from the Class are Defendants herein, the officers and directors of Eqonex, Binance, and Bifinity, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eqonex's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Eqonex shares were traded publicly during the Class Period on the NASDAQ. Record owners and other Class members may be identified from records maintained by Eqonex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.    Plaintiffs' claims are typical of the claims of the Class members as they all were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

79.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Classes are:

        a.    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

b.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eqonex; and/or

c.  to what extent the Class members have sustained damages and the proper measure of damages.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against Farnell and Hai**

81.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

82.    This Count is asserted against primary violators Farnell and Hai, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. In addition, the allegations of this complaint establish Eqonex as a primary violator, even as it is a non-defendant, for the purpose of Plaintiffs' Section 20(a) claim below. Eqonex, Farnell, and Hai are referred to as "Primary Violators" herein.

83.    During the Class Period, Primary Violators, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

84.     Primary Violators violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Eqonex stock during the Class Period.

85.     Primary Violators acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Eqonex were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Primary Violators by virtue of their receipt of information reflecting the true facts of Eqonex, their control over, and/or receipt and/or modification of Eqonex's allegedly materially misleading statements, and/or their associations with Eqonex which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

86.     Primary Violators, who were the senior officers and/or directors of Eqonex, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

87.     As a result of the foregoing, the market price of Eqonex stock was artificially

inflated during the Class Period. In ignorance of the falsity of Primary Violators' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Eqonex stock during the Class Period in purchasing Eqonex stock at prices that were artificially inflated as a result of Primary Violators' false and misleading statements.

88.     Had Plaintiffs and the other members of the Class been aware that the market price of Eqonex stock had been artificially and falsely inflated by Primary Violators' misleading statements and by the material adverse information which Primary Violators did not disclose, they would not have purchased Eqonex stock at the artificially inflated prices that they did, or at all.

89.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

90.     By reason of the foregoing, Primary Violators have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Eqonex stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act Against Defendants**

91.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, Defendants participated in the operation and management of Eqonex, and conducted and participated, directly and indirectly, in the conduct of Eqonex's business affairs. Because of their roles, they knew the adverse non-public information regarding Eqonex's business.

93.     As officers and/or directors of a publicly owned company, the Eqonex Defendants

23

had a duty to disseminate accurate and truthful information with respect to Eqonex's financial condition and results of operations, and to correct promptly any public statements issued by Eqonex which had become materially false or misleading. As controllers of a publicly owned company, Defendants also had a duty to disseminate accurate and truthful information with respect to Eqonex's financial condition and results of operations, and to correct promptly any public statements issued by Eqonex which had become materially false or misleading.

94.     Because of their positions of control and authority as senior officers and controllers of Eqonex, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Eqonex disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants exercised their power and authority to cause Eqonex to engage in the wrongful acts complained of herein. Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Eqonex stock.

95.     Each of Defendants, therefore, acted as a controlling person of Eqonex. By reason of their senior management positions and/or being directors of Eqonex and/or being controllers of Eqonex, each of Defendants had the power to direct the actions of, and exercised the same to cause, Eqonex to engage in the unlawful acts and conduct complained of herein. Each of Defendants exercised control over the general operations of Eqonex and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

96.     By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Primary Violators.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: September 28, 2023                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             */s/ Jacob A. Goldberg*
                                             Jacob A. Goldberg
                                             Leah Heifetz-Li
                                             101 Greenwood Avenue
                                             Suite 440
                                             Jenkintown, PA 19046
                                             Tel: (215) 600-2817
                                             Fax: (212) 202-3827
                                             Email: jgoldberg@rosenlegal.com
                                                     lheifetz@rosenlegal.com
                                             *Lead Counsel*