UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIN LI, Individually and On Behalf of All Others Similarly Situated,

$\qquad$ *Plaintiff*,

v.

EQONEX LIMITED, BINANCE GROUP, BIFINITY UAB, JONATHAN FARNELL, DANIEL LING, ALMIRA CEMMELL, YU HELEN HAI, and ZHAO CHANGPENG,

$\qquad$ *Defendants*.

---

No. 23 Civ. 03346 (GHW)

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

CAHILL GORDON & REINDEL LLP
Samson A. Enzer
Edward N. Moss
Victoria H. Yuhas
32 Old Slip
New York, New York 10005
(212) 701-3000

*Counsel for Defendants Binance, Bifinity, Jonathan Farnell, Daniel Ling, Almira Cemmell, Yu Helen Hai, and Changpeng Zhao*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

THE COMPLAINT'S ALLEGATIONS ................................................................................ 3

ARGUMENT ............................................................................................................................ 6

I.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SECURITIES FRAUD .... 6

   A.   The Complaint Fails to Adequately Allege an Actionable Misstatement ................... 6

     1.   The Statements About the Loan Are Not Actionable ..................................................... 7

     2.   The Statements About the Merger Discussions Are Not Actionable ............................. 8

     3.   The Statements About the Strategic Partnership Are Not Actionable .......................... 11

   B.   The Complaint Fails to Adequately Allege a Strong Inference of Scienter ............... 15

   C.   The Complaint Fails to Adequately Allege Loss Causation ....................................... 18

II.   THE CLAIMS FAIL AGAINST EACH DEFENDANT FOR OTHER REASONS .... 20

   A.   Plaintiffs Fail to State Section 10(b) Claims Against Hai and Farnell ...................... 20

   B.   Plaintiffs' Section 20(a) Claims Fail as to All Defendants ........................................ 22

III.  THE COMPLAINT FAILS TO ESTABLISH PERSONAL JURISDICTION ........ 25

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Capital Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*,
    2019 WL 1436993 (S.D.N.Y. Mar. 30, 2019) (Woods, J.)........................................................6

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)........................................................................................................17

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................................17

*Berdeaux* v. *OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021)................................................................................25

*Boluka Garment Co., Ltd.* v. *Canaan Inc.*,
    547 F. Supp. 3d 439 (S.D.N.Y. 2021)................................................................................18

*Born* v. *Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021)................................................................................10

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................................................................25

*Campo* v. *Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)............................................................................9, 18

*Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)........................................................................................................20

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .....................................................................9

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...............................................................13, 14

*ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................................16

*In re Ehang Holdings Ltd. Sec. Litig.*,
    646 F. Supp. 3d 443 (S.D.N.Y. 2022)................................................................................12

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
    2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ....................................................................10

*Faulkner* v. *Verizon Communications, Inc.*,
  156 F. Supp. 2d 384 (S.D.N.Y. 2001) ............................................................................ *passim*

*In re Fed Ex Corp. Sec. Litig.*,
  517 F. Supp. 3d 216 (S.D.N.Y. 2021) .................................................................................16

*Fila* v. *Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016) .................................................................................23

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005) .................................................................................25

*Greco* v. *Qudian Inc.*,
  2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) (Woods, J.) .........................................12, 14, 23

*Janbay* v. *Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .......................................................................7

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 135 (2011) .........................................................................................................20

*Kleinman* v. *Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ...............................................................................................4

*Lentell* v. *Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ..............................................................................................18

*Leykin* v. *AT & T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006) .................................................................................19

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...............................................................................21, 22

*In re Magnum Hunter Resources Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ..................................................................................15

*In re MGT Cap. Invs., Inc. Sec. Litig.*,
  2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018) .........................................................................8

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ...............................................................................................8

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015) .........................................................................................................11

*Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015) .................................................................................10

*Penguin Grp. (USA) Inc.* v. *American Buddha*,
  609 F.3d 30 (2d Cir. 2010) .......................................................................25

*In re PetroChina Co. Ltd. Sec. Litig.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015) .....................................................19

*In re Philip Services Corp. Sec. Litig.*,
  383 F. Supp. 2d 463 (S.D.N.Y. 2004) ......................................................24

*Plumber & Steamfitters Local 773 Pension Fund, Boston Ret. Sys.* v. *Danske
  Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ..........................................................................7

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund* v. *Fairfax Fin.
  Holdings, Ltd.*,
  886 F. Supp. 2d 328 (S.D.N.Y. 2012) ................................................18, 19

*Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends* v. *Peloton
  Interactive, Inc.*,
  2023 WL 2711342 (S.D.N.Y. Mar. 30, 2023) ...........................................7

*Saraf* v. *Ebix, Inc.*,
  632 F. Supp. 3d 389 (S.D.N.Y. 2022) ......................................................17

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012) ......................................................23

*Stratte-McClure* v. *Morgan Stanley*,
  784 F. Supp. 2d 373 (S.D.N.Y. 2011) ......................................................21

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ......................................................19

*In re Teladoc Health, Inc. Sec. Litig.*,
  2023 WL 4351455 (S.D.N.Y. July 5, 2023) .............................................12

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).................................................................................15

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016).......................................................................8

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020)................................................14, 15

*Westchester Teamsters Pension Fund* v. *UBS AG*,
  604 F. App'x 5 (2d Cir. 2015) ...........................................................21, 22

iv

*Wilder* v. *News Corp.*,
    2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ...........................................................................25

*Woodley* v. *Wood*,
    2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) .........................................................................22

**Statutes**

15 U.S.C. § 78u-4 .......................................................................................................................15

15 U.S.C. § 78u-5 .......................................................................................................................14

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................................6, 7

Fed. R. Civ. P. 12(b) ...................................................................................................................1

Defendants respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 39) ("Complaint" or "AC") for failure to state a claim upon which relief can be granted and lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2).[1]

## PRELIMINARY STATEMENT

This is precisely the type of "strike" suit that the Private Securities Litigation Reform Act ("PSLRA") was intended to prevent.  The Complaint is fatally flawed and should be dismissed.

We recognize that law requires Defendants and the Court to presume that the allegations in the Complaint are true, even though the reality is that they are based on so-called "facts" that Plaintiffs have simply imagined.  But even affording Plaintiffs the benefit of that presumption, the Complaint is fatally flawed and should be dismissed for several independent reasons.

Plaintiffs are alleged shareholders of Eqonex, a digital-assets company that allegedly operated several businesses, including an "Exchange" on which cryptocurrency could be traded, and a custody business ("Digivault"), which was regulated by the U.K. Financial Conduct Authority ("FCA") and allowed users to store digital assets.  In March 2022, Eqonex allegedly entered into a strategic partnership with another financial-technology company, Bifinity (which was allegedly launched by Binance).  As part of the partnership, (i) Bifinity allegedly (a) extended a $36 million convertible loan to Eqonex and (b) obtained the right to appoint a number of Eqonex officers and nominate directors; and (ii) both companies allegedly (a) agreed to continue their "non-binding" and "exploratory" discussions about a "potential" merger; and (b) at the same time, as part of the partnership's initial phase, disclosed that they would "leverage" Eqonex's FCA-

---

[1] In this submission, (i) "Eqonex" refers to Eqonex Limited; (ii) "Bifinity" refers to Bifinity UAB; and (iii) "Binance" refers to Binance Group (an entity that is named as a Defendant but does not actually exist). Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

regulated custody business, Digivault, and "strengthen" the Exchange.  Plaintiffs allege that, ultimately, Eqonex ended up being unable to repay the loan and became insolvent, the Exchange was shut down, and the two companies agreed that Bifinity would acquire 100% of Digivault.

These garden-variety disclosures do not provide a valid basis to sue for securities fraud. The Complaint fails to meet the applicable heightened pleading standards for several reasons:

*First*, the Complaint fails to allege any actionable misstatement or omission.  Plaintiffs have not pleaded facts establishing that any of the supposed misstatements in the two March 2022 press releases at issue were actually false when made.  So, instead, Plaintiffs have just made up "facts" and claimed they were omitted.  Specifically, they speculate that, at the time of the press releases, Defendants must have known that (i) Eqonex could never repay the loan, and (ii) Bifinity never intended to merge with Eqonex, but rather this was supposedly all a scheme for Binance to take control of Digivault.  But the Complaint does not contain a single factual allegation to support this wild conspiracy theory.  Plaintiffs cannot manufacture a claim by imagining "facts" and saying they were omitted.  In any event, the statements are not actionable because they are (i) corporate puffery and (ii) forward-looking statements protected by the PSLRA's safe harbor provision.

*Second*, Plaintiffs do not come close to pleading the requisite "strong inference of scienter." The Complaint lacks allegations showing that any Defendant had motive or opportunity to commit fraud.  And Plaintiffs barely try to plead conscious misbehavior or recklessness.  The Complaint does not allege a single fact establishing that any Defendant knew (or recklessly disregarded) that any of the challenged statements were false when made.  Plaintiffs cite no emails, no text messages, no internal meetings, and no confidential witnesses.  Instead, the Complaint is based exclusively on speculative accusations, as well as unrelated alleged conduct by Binance that has nothing to do with Eqonex.  Nor are Plaintiffs' conclusory assertions remotely plausible.  If Bifinity really had

wanted to take over Digivault, then nobody had to commit securities fraud—Bifinity **could have just merged** with Eqonex.  Plaintiffs' silence on their theory of fraudulent intent is deafening.

*Third*, Plaintiffs fail to plead loss causation.  Although Plaintiffs point to two supposedly corrective disclosures, there is nothing "corrective" about them (and there was nothing to correct anyway).  As discussed below, there is no nexus between the alleged misstatements and the supposed corrective disclosures—which are more accurately described as new, negative news.

*Fourth*, Plaintiffs fail to state a claim against any Defendant for other reasons, including that none of the Defendants accused of violating Section 10(b) were the "maker" of the claimed misstatements, and Plaintiffs' "control" person allegations are boilerplate, conclusory, and suffer from group pleading—and thus do not state a claim under Exchange Act Section 20(a).

*Finally*, in addition to failing to state a claim, the Complaint lacks any factual allegations to support personal jurisdiction.

Plaintiffs cannot plead around these fundamental flaws.  For these and the other reasons discussed below, the Court should dismiss the Complaint with prejudice.

## THE COMPLAINT'S ALLEGATIONS

Plaintiffs assert claims (i) under Section 10(b) against Defendants Farnell and Hai and (ii) under Section 20(a) against every Defendant, based on the following allegations:

### *The Supposedly "Misleading" Statements*

Plaintiffs allege that Eqonex made several misstatements in two March 2022 press releases:

*The March 7 Press Release*.  On March 7, Eqonex announced it had entered into a "strategic partnership" with Bifinity and that: (i) Bifinity would "advance a $36 million convertible loan to Eqonex"; (ii) Bifinity had the right to appoint several Eqonex officers and nominate two directors; (iii) the strategic partnership would "initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the EQONEX Exchange, and expanding

3

Bifinity's geographical footprint through EQONEX's licensing framework"; (iv) the companies would "work together to maximize business synergies created by this new strategic relationship and capitalize on opportunities to cooperate and further expand their business"; and (v) Bifinity and Eqonex would "continue to engage in non-binding discussions to explore potential merger opportunities, subject to regulatory approval." (AC ¶¶ 47-49). Eqonex later filed the entire loan agreement with the U.S. Securities and Exchange Commission ("SEC"). *See* January 12, 2024 Declaration of Victoria H. Yuhas ("Yuhas Decl."), Ex. 1.[2]

*The March 17 Press Release*. In this press release, Eqonex announced that it and Bifinity had taken "the next step in solidifying their strategic partnership with the appointment of EQONEX's new CEO [Farnell] and two new members to the EQONEX Board of Directors [Farnell and Hai]." (AC ¶ 53). The release also included the generic, optimistic statements that (i) Farnell would "play an instrumental role in fast-tracking the collaboration between both businesses" and was "looking forward to fostering true collaboration and productivity across both businesses across both teams"; (ii) Bifinity "will develop ways to leverage the EQONEX Exchange as an alternative trading platform, deploy resources to strengthen the technology, and also explore opportunities to scale the asset management business"; and (iii) the business as a whole would have "the potential to be transformative for the industry." (*Id.* (emphasis omitted)).

Although the Complaint is not a model of clarity, Plaintiffs appear to be alleging that three categories of statements within these two press releases were false or misleading:

- **Statements About the Loan.** Plaintiffs allege that statements about the loan agreement were misleading because "Eqonex had no way to repay Bifinity pursuant to the terms of the Loan Agreement." (*Id.* ¶ 50).

---

[2] The Court can consider on this motion the loan agreement and other SEC filings cited in this brief. *See Kleinman* v. *Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

- ***Statements About the Non-Binding Merger Discussions.***  Plaintiffs allege that statements concerning the discussions about a potential merger were misleading because "Defendants did not intend to consummate a merger between Eqonex and Bifinity (or Binance)."  (*Id.*).

- ***Statements About the Strategic Partnership.***  Plaintiffs allege that Defendants "materially misled investors concerning the partnership between Eqonex and Bifinity," because it was supposedly "simply an attempted end-run around the FCA's ban on Binance undertaking any regulated activity in the U.K.  (*Id.* ¶ 54; *see also id.* ¶ 50 (similar)).

Plaintiffs also try to recast many of these alleged misstatements as "omissions."  (*See id.* ¶ 50 (alleging that Defendants "left out [the] critical context" that they were supposedly using the strategic partnership "to get around the FCA's ban on Binance undertaking any regulated activity in the U.K."); *id.* ¶ 18 (alleging that Defendants "fail[ed] to disclose that Eqonex had on [*sic*] way to pay Bifinity back for the Loan and that there were no plans to work towards a merger")).

### The Supposedly "Corrective" Disclosures

Plaintiffs allege that they suffered losses "when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed[.]"  (*Id.* ¶ 69).  They allege that the "truth" was revealed in two disclosures:

<u>The August 15 Disclosure</u>.  Eqonex announced that it had decided to "streamline its operations and focus resources primarily on the businesses that offer the most potential for revenue growth and long-term financial sustainability," and thus it would be closing its Exchange and focusing on, among other things, its custody business (*i.e.*, Digivault).  (*Id.* ¶ 59).  That same day, "Bifinity granted Eqonex a waiver for the cessation of a major business and Eqonex agreed to increase Bifinity's share charge of Digivault under the loan agreement . . . to 100%."  (*Id.* ¶ 12).

<u>The November 21, 2022 Disclosure</u>.  Eqonex announced that it was "currently in breach" of its loan agreement with Bifinity and that its "financial resources . . . may not be sufficient . . . which may cast significant doubt on [Eqonex's] ability to continue as a going concern."  (*Id.* ¶ 62).

### *The Threadbare Scienter Allegations*

Plaintiffs do not allege a single fact to even try to demonstrate that any Defendant knew (or recklessly disregarded) that the allegedly misleading statements were false when made. The Complaint does not, for example, include a single quote from any confidential witness, nor does it identify any internal document or meeting to even suggest that any Defendant had knowledge of any information that actually contradicted any of Eqonex's public statements.

Instead, Plaintiffs speculate that "Defendants had no intention of actually consummating a merger between Eqonex and Binance or Bifinity," that they somehow knew that the loan "was not sufficient to stave off Eqonex's insolvency," and that this was all part of some master plan to take control of Digivault so Binance could "evade" the FCA's ban. (*Id.* ¶ 10). The Complaint includes the boilerplate assertions that Defendants "acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Eqonex were materially false and misleading," received unspecified "information reflecting the true facts of Eqonex," and "had actual knowledge of the material omissions and/or the falsity of the material statements set forth above[.]" (*Id.* ¶¶ 85-86). But Plaintiffs' only attempt to try to support their speculation is to allege that "Binance and its executives have consistently acted to subvert financial regulators" (*id.* ¶ 64) and have made other efforts "to undermine rather than comply with the FCA" (*id.* ¶ 66).

## <u>ARGUMENT</u>

The Complaint fails to state a plausible securities fraud claim against any Defendant. As discussed below, Plaintiffs do not plead fraud with the particularity required by Federal Rule 9(b) and the PSLRA. *See Alpha Capital Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, 2019 WL 1436993, at *6 (S.D.N.Y. Mar. 30, 2019) (Woods, J.) (applying heightened pleading standards).

## I.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SECURITIES FRAUD

### A.    The Complaint Fails to Adequately Allege an Actionable Misstatement

At the outset, Plaintiffs' claims fail because the Complaint does not allege any actionable misstatement or omission. *See Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends* v. *Peloton Interactive, Inc.*, 2023 WL 2711342, at *15 (S.D.N.Y. Mar. 30, 2023) (dismissing claim where Plaintiff "failed to plead any actionable misstatement or omission").

### 1.      The Statements About the Loan Are Not Actionable

Plaintiffs allege that Eqonex disclosed in its March 7 press release that "Bifinity would advance a $36 million convertible loan to Eqonex." (AC ¶ 47). They do not allege that this statement was false, or that Eqonex made any other false statements about the terms of the loan. Nor could they—because the loan agreement itself was also filed publicly. (Yuhas Decl., Ex. 1).

Unable to allege falsity, Plaintiffs instead attempt to recast their claim as omission-based. They allege that the loan-related statements were misleading because they omitted that (i) the loan "was not sufficient to stave off Eqonex's insolvency," and (ii) "Eqonex had no way to repay Bifinity pursuant to the terms of the Loan Agreement." (AC ¶¶ 10, 50). But Plaintiffs do not plead any facts showing that, as of March 7, either of these assertions—which are based only on Plaintiffs' say-so—reflect reality. Plaintiffs cannot bootstrap a securities fraud claim by imagining "facts" and saying they were omitted. *See Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *4 (S.D.N.Y. Mar. 30, 2012) ("Under Rule 9(b), [a plaintiff] must plead specific facts explaining why each alleged misstatement was false at the time it was made."); *Plumber & Steamfitters Local 773 Pension Fund, Boston Ret. Sys.* v. *Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) (rejecting plaintiffs' attempt to "circumvent [the] defect" in their misleading statement claim by "recast[ing] this claim as one of misstatement by omission").

Moreover, in addition to disclosing the entire loan agreement, Eqonex's SEC filings also accurately disclosed its financial information—meaning that investors could have determined for themselves whether the loan was likely to be repaid, or whether it might be sufficient for Eqonex

to stave off bankruptcy.  For example, two months before the loan was announced, Eqonex (i) disclosed that it had incurred an "operating loss[]" of $64.6 million in 2021; and (ii) specifically warned that it was "subject to many of the risks common to early-stage enterprises, including under-capitalization [and] cash shortages[.]"  (Yuhas Decl., Ex. 2 at 6) ("January Prospectus").

Having accurately disclosed the objective facts, Defendants had no duty to editorialize or characterize them.  *See In re MGT Cap. Invs., Inc. Sec. Litig.*, 2018 WL 1224945, at \*11 (S.D.N.Y. Feb. 27, 2018) ("Once a company discloses material objective factual matters, it need not characterize or editorialize on those facts in any particular way.").  To the extent Plaintiffs argue that Defendants should have predicted that Eqonex would be unable to repay the loan or would become insolvent, that would be inconsistent with the law.  *See Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.").

### 2.  The Statements About the Merger Discussions Are Not Actionable

Next, Plaintiffs challenge the March 7 statement that Bifinity and Eqonex would "continue to engage in non-binding discussions to explore potential merger opportunities[.]"  (AC ¶ 48).  Again, Plaintiffs cannot and do not allege falsity.  *See Tongue* v. *Sanofi*, 816 F.3d 199, 213-14 (2d Cir. 2016) (affirming lower court holding of failure to plead falsity).  The Complaint does not allege, for example, that Bifinity and Eqonex were ***not*** engaged in non-binding discussions as of March 7, nor that they did ***not*** plan to continue those discussions after March 7.  In fact, SEC filings confirm that the discussions about a potential merger ***did*** continue for months.  For example, Eqonex's August 2022 Annual Report disclosed that the parties "continue to engage in non-binding discussions to explore potential merger opportunities."  (Yuhas Decl., Ex. 3 at 9).

Because they cannot plead falsity, Plaintiffs again pivot to an omission theory—alleging that the statement was materially misleading because Defendants failed to disclose that they "did

not intend to consummate a merger." (AC ¶ 50). But Plaintiffs do not plead a single fact to suggest that, as of March 7, the parties did not intend to consummate a merger. And Plaintiffs' speculation about the parties' intent as of March 7 is implausible given that the merger discussions *did continue* for months. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *20 (S.D.N.Y. Mar. 24, 2023) (rejecting plaintiff's claims that statements were misleading because plaintiff "offer[ed] nothing beyond conjecture"); *see also Campo* v. *Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA].").

Plaintiffs' speculation that Bifinity only entered into merger discussions as a ruse because Binance wanted to control Digivault is also implausible. Based on the logic of Plaintiffs' own corporate-control allegations, a merger would have allowed Binance to control Digivault, which Plaintiffs speculate was the plan all along. Yet Plaintiffs fail to explain how *not* merging would have given Binance a better chance of controlling Digivault than merging.

Moreover, Plaintiffs fail to explain how investors could have been misled to believe that a merger was certain when the disclosure said just the opposite. Eqonex's press release specifically disclosed that the parties were in "non-binding discussions" in order "to explore potential merger opportunities," and that any potential merger would be "subject to regulatory approval." (AC ¶ 48). Similarly, in an April 29, 2022 SEC filing, Eqonex warned investors that although the loan agreement obligated Bifinity to discuss a merger "in good faith," it "[did] not obligate [the parties] to enter into definitive binding agreements or complete the [potential merger] on such terms or at all or to engage in any other transaction." (Yuhas Decl, Ex. 4). The filing further warned that "[n]o assurance can be provided as to if or when the parties may enter into any definitive binding agreements in connection with [a potential merger]." (*Id.*) Furthermore, Eqonex's August 2022

Annual Report plainly and unambiguously stated that although "non-binding discussions to explore potential merger opportunities" remained ongoing, "it is possible that . . . Eqonex and Bifinity may not ultimately enter into a merger transaction."  (Yuhas Decl., Ex. 3 at 9).

Given these disclosures, no reasonable investor would have believed that the merger talks were anything but preliminary.  *See, e.g.*, *Elliott Assocs., L.P.* v. *Covance, Inc.*, 2000 WL 1752848, at *2, 9 (S.D.N.Y. Nov. 28, 2000) (finding inactionable statements that merger was "on track to close" given "the . . . uncertainty as to whether any proposed merger will actually be completed").

Indeed, courts routinely dismiss securities fraud allegations based on the failure to consummate potential mergers that are much further along than the exploratory, non-binding discussions at issue here.  For example, *Faulkner* v. *Verizon Communications, Inc.* involved a potential merger between Verizon and NorthPoint.  156 F. Supp. 2d 384 (S.D.N.Y. 2001).[3]  The parties announced in August 2000 that they had signed a merger agreement, which required Verizon to use "commercially reasonable efforts" to close.  *Id.* at 388.  Two weeks later, Verizon announced "that the Merger was expected to be completed in mid-2001," and two months after that, NorthPoint's CEO told investors that "the merger with Verizon continues on schedule."  *Id.* at 388-89.  Then, another month later, NorthPoint reiterated that "we continue to be on track with our prior expectation of closing the Verizon transaction in the first half of 2001."  *Id.* at 389.

But Verizon terminated the agreement, and then NorthPoint's noteholders sued, alleging that the statements concerning the "status" of the merger were misleading because Verizon did not

---

[3] *See also Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 486-89 (S.D.N.Y. 2021) (dismissing statements describing the Department of Justice's antitrust review of a potential acquisition as "going as planned" and "as expected" absent particularized facts showing "contemporaneous falsity"); *Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 649 (S.D.N.Y. 2015) (dismissing statement that "the Company was investigating potential accretive acquisitions and potential joint ventures" as a non-guarantee that was too broad to be actionable).

intend to close.  *Id.* at 390, 397.  The court dismissed the claim, holding that the merger-related statements were "merely expressions of optimism concerning an uncertain future event" that were not actionable unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *Id.* at 397-98.[4]  The court also explained that the plaintiffs had failed to allege falsity because "there are no facts from which it could be inferred that Verizon had in fact decided to terminate the merger."  *Id.* at 400.

The case for dismissal here is far stronger.  Bifinity and Eqonex ***never*** entered into a binding merger agreement and ***never*** made any statements about when the merger might close.  Just the opposite: Eqonex specifically told the market that the discussions were "non-binding" and "explor[atory]," (AC ¶ 48), and even expressly warned investors that it was possible no agreement would ever be signed (let alone closed) (Yuhas Decl., Ex. 3 at 9).  Although Plaintiffs here (like the *Faulkner* plaintiffs) speculate that Bifinity (like Verizon) did not intend to merge, they (again, like the *Faulkner* plaintiffs) do not plead a single fact to support their speculation.

        3.      <u>The Statements About the Strategic Partnership Are Not Actionable</u>

Although the Complaint's muddled allegations are difficult to discern, the third category of alleged misstatements appears to be those relating to the strategic partnership.  (*See id.* ¶¶ 50, 54).  Just like the other categories, none of these statements are actionable.

*First*, Plaintiffs point to several statements touting potential benefits of the partnership:

- the companies would "work together to maximize business synergies . . . and capitalize on opportunities to cooperate and further expand their business";

---

[4] *Faulkner*'s holding is not undermined by the subsequent decision in *Omnicare, Inc*. v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) because the *Faulkner* court found that (i) there were "absolutely no facts to support an inference that . . . Verizon did not . . . believe any of its statements to be untrue," 156 F. Supp. 2d at 399, and (ii) plaintiffs failed to allege that the defendant knew information that was inconsistent with the representation at issue, *id.* at 396-97, 400.  The same is true here.

- as CEO, Defendant Farnell would "play an instrumental role in fast-tracking the collaboration between both businesses" and was "looking forward to fostering true collaboration and productivity across both businesses"; and

- the exchange created an "opportunity to create a full ecosystem by harnessing Bifinity's technology, marketing clout and client base," and had "the potential to be transformative[.]"

(*See id.* ¶¶ 47, 53 (emphasis omitted)).  But such "[g]eneral statements of optimism and puffery are non-actionable" because "they are not sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome," and "speakers are not required to take a gloomy, fearful or defeatist view of the future."  *Greco* v. *Qudian Inc.*, 2022 WL 4226022, at *9 (S.D.N.Y. Sept. 13, 2022) (Woods, J.).  Because Eqonex's vague and generalized statements are quintessential examples of puffery, they cannot support a claim for securities fraud.  *See, e.g.*, *See In re Teladoc Health, Inc. Sec. Litig.*, 2023 WL 4351455, at *7 (S.D.N.Y. July 5, 2023) (dismissing as puffery statements regarding two companies' "'aligned' cultural values, their 'shared mission,' and how they 'really do fit together,'" and "that the merger would create 'new opportunities' and was 'resonating in the marketplace'").

    *Second*, Plaintiffs identify statements in which Eqonex set forth its initial business plan for Digivault and the Exchange:

- the partnership would "initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the EQONEX Exchange, and expanding Bifinity's geographical footprint"; and

- "[t]he initial phase of this groundbreaking strategic partnership will put in place a framework for Bifinity to safeguard some of its client assets with EQONEX's FCA registered custodian, Digivault, in compliance with all applicable regulatory requirements."

(AC ¶¶ 48, 53).  These statements are not actionable for several reasons.

    **No Falsity**.  The statements are not adequately alleged to have been false when made.  *See In re Ehang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 458 (S.D.N.Y. 2022) ("The Exchange

Act requires that the complaint shall specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading."). Plaintiffs do not allege that, as of March 2022, Defendants **did not** plan to initially "leverage" Digivault and "strengthen" the Exchange. In fact, leveraging Digivault is entirely **consistent** with Plaintiffs' speculative theory that Binance wanted to control Digivault. (*See* AC ¶¶ 50, 54, 57). Plaintiffs do not even plead facts to show that the statements turned out to be false. The Complaint has nothing to suggest that during the "initial phase," Defendants did **not** leverage Digivault or strengthen the Exchange.

To the contrary, later public filings confirm that the strategic partners did leverage Digivault. For example, on August 15—five months after the strategic partnership was announced—Eqonex disclosed that Digivault and another business line had "***already made solid progress with the additional resources that we have allocated to them recently***, and we are bullish about their prospects as we become an organization focused on these high-potential business areas." (*Id.* ¶ 59). Although Eqonex on that same day announced it would be closing the Exchange, that means that the Exchange **had been open** for the previous five months. There is nothing to suggest that Eqonex had not been "strengthening" it between March and August. Nor does the fact that Eqonex closed the Exchange in August mean that anyone knew in March that Eqonex would do so. The more plausible inference is that the business strategy had changed, which "does not, without more, render [a company's] past disclosures . . . misleading." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *11 (S.D.N.Y. Mar. 30, 2021).

**Puffery**. The statements that the strategic partnership would be "groundbreaking" (AC ¶ 53), "leverag[e] Digivault" (*id.* ¶ 48), "strengthen the technology" (*id.* ¶ 53), and "expand[] Bifinity's geographical footprint" (*id.* ¶ 48), should be dismissed as mere puffery. *See Faulkner*, 156 F. Supp. at 388, 400 (dismissing fraud claims based on statements that "the merger was a

groundbreaking agreement" and "this deal combines complementary assets . . . to provide the scale to fuel growth"); *see also Diebold*, 2021 WL 1226627, at *9 (holding that statements about "'confidence' in [management's] ability to integrate [the two companies]" and citing "the 'collaborative' nature of the business and the 'teamwork' being leveraged to integrate" were "precisely the type of puffery that the Second Circuit . . . [has] held to be nonactionable").

**Forward-Looking Statements**.  As discussed above, the statements that Eqonex would "initially focus on . . . strengthening the technology supporting the EQONEX Exchange" " (AC ¶ 48) and "[m]oving forward, Bifinity will develop ways to leverage the EQONEX Exchange as an alternative trading platform" (*id.* ¶ 53) are not actionable because they (i) are not adequately alleged to have been false when made and (ii) are mere corporate puffery.  Plaintiffs may be disappointed that Eqonex eventually ended up closing its Exchange, but their allegations amount to nothing more than impermissible claims of fraud by hindsight.  *See Greco*, 2022 WL 4226022, at *9 ("The Second Circuit has firmly rejected the 'fraud by hindsight' approach.").

These forward-looking statements about the Exchange are also protected by the PSLRA's safe harbor.  *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 252-53 (S.D.N.Y. 2020) ("Under the PSLRA's safe harbor, a defendant 'shall not be liable with respect to any forward-looking statement' if . . . the forward-looking statement is 'identified' as such and 'accompanied by meaningful cautionary statements[.]'") (quoting 15 U.S.C. § 78u-5(c)).  Eqonex repeatedly and specifically warned not only that it might have to exit certain business lines and stop certain projects, but also that it might stop operating the Exchange itself:

- "There are substantial risks and uncertainties" associated with "undertak[ing] . . . ***strategic projects***."  (January Prospectus at 6).

- "The development of the Exchange requires significant capital funding, expertise on the part of Eqonex's management and time and effort in order to be successful," and Eqonex

"***may be unable to develop the Exchange*** in a way that realizes . . . any form of a functioning network." (*Id.* at 24).

- "The Exchange may face competition from . . . alternative networks, ***which could negatively impact the Exchange*** and have a material adverse effect on Eqonex's business, financial condition and results of operations," and "[i]f the Exchange is unable to offer features that differentiate it from . . . competitors, or . . . . competitors create pricing pressure that results in lower-than-anticipated revenues, ***the Exchange may not be viable***, which could have a material adverse effect on Eqonex's business, financial condition and results of operations." (*Id.* at 25).

- "It is possible that some of Eqonex's business lines may be difficult to enter and/or it may become evident that a particular business line is not a productive use of capital or time," which "could result in Eqonex modifying its business and ***focus away from such business lines***." (*Id.* at 6).

(*See also* Eqonex's May 2, 2022 prospectus, Yuhas Decl., Ex. 5 at 6, 24-25 (same)). It is difficult to imagine more particularized warnings. *See Weight Watchers*, 504 F. Supp. 3d at 255 (applying safe harbor where cautionary language "disclose[d] the *exact* risk of which [p]laintiffs complain[ed]") (emphasis in original).

### B.    The Complaint Fails to Adequately Allege a Strong Inference of Scienter

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). The word "strong" means that "the inference of scienter must be more than merely reasonable or permissible[.]" *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference[.]" *Id.* The Complaint falls woefully short of meeting this standard. It contains (i)  no "facts to show that defendants had both motive and opportunity to commit fraud," and (ii) no "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Magnum Hunter Resources Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 292 (S.D.N.Y. 2014).

15

*First*, the Complaint does not allege facts showing "both motive and opportunity." "Motive is established if the plaintiff alleges concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and "[o]pportunity is the means and likely prospect of achieving concrete benefits by the means alleged." *Faulkner*, 156 F. Supp. 2d at 393.

The word "motive" does not appear in the Complaint, and so it is unclear whether Plaintiffs are even attempting to allege scienter through motive and opportunity. To the extent they are alleging some sort of generic profit motive, that gambit would fail under well-settled law. *See ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [the scienter] inquiry.").

To the extent Plaintiffs are alleging that Defendants had a motive or opportunity to commit fraud so that Binance (allegedly through Bifinity) could take control of Eqonex's Digivault (*see* AC ¶¶ 66–67), that makes no sense. Eqonex disclosed that (i) Bifinity was (a) entering into a strategic partnership with Eqonex that would allow Bifinity to appoint a number of officers and nominate directors and, thus, make strategic decisions over Eqonex's business lines including Digivault, and (b) even discussing whether to potentially merge with Eqonex; and (ii) a key initial priority of the strategic partnership was to leverage Digivault. (*See id.* ¶¶ 47-50). Thus, investors knew that Bifinity effectively controlled, or was going to control, Digivault ***anyway***—and committing securities fraud would have done ***nothing*** to advance that supposed objective. *See In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 237 (S.D.N.Y. 2021) ("To adequately plead motive and opportunity, a plaintiff must allege that the defendant benefitted in some concrete and personal way from the purported fraud.").

16

*Second*, the Complaint contains no facts to even suggest conscious misbehavior or recklessness.  Plaintiffs do not allege a single fact to show that a single Defendant knew that a single alleged misstatement was false when made (or knew the information that was supposedly omitted).  The Complaint is devoid of anything to support Plaintiffs' fanciful theory that Defendants must have known that Binance had a master plan to use Digivault for its own purposes and hang the rest of Eqonex out to dry.  The Complaint does not cite, for example, to a single document, a single meeting, or a single statement from a single confidential witness.  Instead, Plaintiffs support their speculation with only boilerplate allegations.  (*See, e.g.*, AC ¶ 86 ("Primary Violators, who were the senior officers and/or directors of Eqonex, had actual knowledge of the material omissions and/or the falsity of the material statements . . . or, in the alternative, acted with reckless disregard for the truth[.]"); *id.* ¶ 92 ("Because of their roles, [Defendants] knew the adverse non-public information regarding Eqonex's business.")).  That is insufficient.  *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("[T]he plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Plaintiffs also insinuate that Defendants must have been using Digivault to circumvent the FCA's ban based on generalized assertions that Binance supposedly has "acted to subvert financial regulators," including the FCA, in the past.  (*See* AC ¶¶ 64–66).  But these unsubstantiated accusations about other events do nothing to help Plaintiffs allege conscious misbehavior ***in this case***.  *See Saraf* v. *Ebix*, *Inc.*, 632 F. Supp. 3d 389, 400-01 (S.D.N.Y. 2022) ("[P]revious instances in which [defendant] was accused of misconduct, including undisclosed tax investigations" did not

support scienter); *see also Campo*, 635 F. Supp. 2d at 336 ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy . . . [the PSLRA]"); *Faulkner*, 156 F. Supp. 2d at 395-96 (declining to find recklessness where "the Complaint [was] devoid of any facts which would support" the allegation regarding defendant's state of mind).

### C.    The Complaint Fails to Adequately Allege Loss Causation

"To plead loss causation, the complaint[] must allege facts that support an inference that [the alleged] misstatements and omissions concealed the circumstances that bear upon the loss[.]" *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005).  This can be accomplished with: (i) a plausible "allegation that the market reacted negatively to a corrective disclosure regarding the falsity" of the alleged misstatements, *id.* at 175, or (ii) plausible allegations that the "misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss," *Boluka Garment Co., Ltd.* v. *Canaan Inc.*, 547 F. Supp. 3d 439, 445 (S.D.N.Y. 2021).  The Complaint here has neither.

The Complaint does not allege a materialization-of-risk theory, and so it tries to allege that the supposed "truth" was revealed by allegedly "corrective" disclosures.  (*See* AC ¶¶ 59–63).  But a disclosure can be corrective "only if it possesses a sufficient nexus to a prior misstatement such that it reveals at least part of the [alleged] falsity of that misstatement."  *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund* v. *Fairfax Fin. Holdings, Ltd.*, 886 F. Supp. 2d 328, 337-38 (S.D.N.Y. 2012).  Plaintiffs' two alleged corrective disclosures here do not.

*First*, Plaintiffs rely on Eqonex's August 15, 2022 press release, which announced that (i) Eqonex was closing its Exchange (*see* AC ¶ 59); and (ii) the parties had agreed to increase Bifinity's share charge of Digivault under the loan agreement (*see id.* ¶ 12).  But Eqonex never said it would keep its Exchange open for any specified period of time, nor did the parties ever promise that they would not modify their relationship with respect to Digivault.  To the contrary,

as discussed above, Eqonex expressly disclosed that the Exchange might not be *viable*, and that it and Bifinity were engaged only in *exploratory discussions* that could result in several different types of partnerships (or none) going forward.  (January Prospectus at 25; Yuhas Decl., Ex. 4). Thus, because there is no nexus between the alleged misstatements and the allegedly corrective disclosures, the Complaint fails to allege loss causation.  *See Fairfax*, 886 F. Supp. 2d at 338 (finding no loss causation where there was "no logical connection" between alleged misstatements and corrective disclosures).  Moreover, if Eqonex's stock dropped because the market viewed the closing of the Exchange as negative news, that would be insufficient.  *See Leykin* v. *AT & T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006) ("[L]oss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").

    *Second*, Plaintiffs rely on Eqonex's November 21, 2022 disclosures that it was "currently in breach" of its loan agreement with Bifinity and that its "financial resources . . . may not be sufficient to satisfy . . . working capital requirements . . . which may cast significant doubt on [Eqonex's] ability to continue as a going concern."  (AC ¶ 62).  But the breach was a new development that did not contradict *any* prior statement—and certainly did not "correct" the mere disclosure that the parties had entered into a loan agreement.  Nor did the statement that there was "doubt" about Eqonex's ability to continue as a going concern correct any prior statement.  Thus, the November 2022 disclosure "did not provide investors with enough information to conclude . . . that [Defendants'] prior statements were in some way false."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 (S.D.N.Y. 2008); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 368 (S.D.N.Y. 2015) (finding an article generally touching on allegedly concealed issues insufficient where it "[did] not immediately reveal the falsity of any of [defendant's] alleged misrepresentations or omissions").

## II.   THE CLAIMS FAIL AGAINST EACH DEFENDANT FOR OTHER REASONS

Plaintiffs' claims also fail for additional reasons as to each Defendant.  These failures largely arise from the same problem:  Plaintiffs are suing the wrong people and entities.  Although Plaintiffs are Eqonex shareholders complaining about Eqonex's public disclosures, they are not suing Eqonex.[5]  Rather, because Eqonex is insolvent, Plaintiffs have tried to manufacture a claim against others who are connected (and many who are quite remotely connected) to Eqonex.

In any event, Plaintiffs fail to allege a primary violation because, among other reasons, they do not assert a Section 10(b) claim against any "maker" of any alleged misstatement.  *See Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding that the maker "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").  Their Section 20(a) claims for control-person liability fail because the Complaint contains no factual allegations to show that any Defendant (let alone each one) actually controlled Eqonex's public statements.  This case, then, is largely an improper attempt to bring "aiding and abetting" claims—which are not available for private plaintiffs.  *See Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

### A.   Plaintiffs Fail to State Section 10(b) Claims Against Hai and Farnell

***Defendant Hai.***  Defendant Hai is alleged to have been an Eqonex Director from March 17 to April 28, 2022.  (AC ¶ 31).  She is alleged to have made only one misstatement, contained in Eqonex's March 7 press release, that Eqonex's "institutional approach and ability to utilize global regulatory frameworks to build a compliant business directly complements our retail focus and will greatly benefit Bifinity over the long-term."  (*Id.* ¶ 48).  Hai obviously was the "maker"

---

[5] Confusingly (and inconsistently), Plaintiffs name (i) Eqonex in the case caption, (ii) refer to Eqonex as a "non-party defendant" (AC ¶ 1), and (iii) assert no causes of action against Eqonex.

of that statement, but it is paradigmatic—and inactionable—puffery.  She, however, cannot fairly be said to be the "maker" of any other statements in Eqonex's March 7 release: she (i) was not yet an Eqonex Board member (*see id.* ¶ 31); (ii) was identified in that very release only as "President of Bifinity" (Yuhas Decl., Ex. 6); and (iii) did not sign the press release (Eqonex's CFO did) (*see id.*).  Thus, Plaintiffs cannot state any claim against her based on the March 7 release.  *See Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 384 n.8 (S.D.N.Y. 2011) (noting that "[o]bviously . . . statements made" when defendants were not working at the relevant company "can not be attributed to them" for Section 10(b) purposes); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.14 (S.D.N.Y. 2014) (holding that without any "particularized allegations that he had any role in shaping their content," a former executive could not be held liable for statements he did not sign).

As for the March 17 press release, that was Defendant Hai's very first day as an Eqonex Director, and she did not sign that statement either.  Again, Eqonex's CFO did.  (*See* Yuhas Decl., Ex. 7) (signed by Paul Ewing)).  Plaintiffs allege no facts to tie Defendant Hai to the March 17 press release, so for similar reasons as discussed above, she was not its "maker."

Moreover, the claims against Defendant Hai should be dismissed on the independent basis that there is not ***a single substantive allegation*** about her in the entire Complaint.  Thus, in addition to failing to allege that she made an actionable misstatement, Plaintiffs fail to allege scienter.  *See Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5, 7 (2d Cir. 2015) (finding failure to allege scienter when pleadings included no defendant-specific facts).

***Defendant Farnell.***  Like Defendant Hai, Defendant Farnell is not alleged to have joined Eqonex until March 17, 2022.  (*See* AC ¶ 28).  Thus, for the same reasons discussed above, he did not "make" any statement in the March 7 press release (which he did not sign either).

As for the March 17 release, Defendant Farnell is quoted only as saying that Eqonex's business lines were an "opportunity to create a full ecosystem by harnessing Bifinity's technology, marketing clout and client base," which would have "the potential to be transformative for the industry," and that he was "looking forward to fostering true collaboration and productivity across both businesses across both teams." (*Id.* ¶ 53). Although Defendant Farnell made these statements, they are puffery and not adequately alleged to be false. As for the other statements in the March 17 release, however, Defendant Farnell was not the "maker." He did not sign the release. (*See* Form 6-K, Yuhas Decl., Ex. 7 (signed by Paul Ewing)). Eqonex issued the release (which was most likely prepared before March 17) specifically to announce that Defendant Farnell had been appointed to serve as the new CEO (it was entitled "EQONEX Appoints New CEO as part of its Strategic Partnership with Bifinity" — "Former Head of Binance UK Jonathan Farnell appointed CEO of EQONEX"). Courts have dismissed securities fraud claims in similar situations. *See, e.g.*, *Lululemon*, 14 F. Supp.3d at 576 n.14 (finding defendant could only be the "maker" for statements that he signed and could "not be found liable for any other statements, because there [we]re no particularized allegations that he had any role in shaping their content.").

In addition, as with Defendant Hai, the claims against Defendant Farnell should be dismissed for the independent reason that the Complaint does not have ***a single substantive allegation*** about him. Thus, besides failing to allege that he made an actionable misstatement, Plaintiffs fail to allege scienter. *See Westchester Teamsters Pension Fund*, 604 F. App'x at 7.

B.    **Plaintiffs' Section 20(a) Claims Fail as to All Defendants**

The Section 20(a) claims should be dismissed because, as discussed above, Plaintiffs have failed to plead a primary violation. *See Woodley* v. *Wood*, 2022 WL 103563, at *10 (S.D.N.Y. Jan. 11, 2022) ("Because Plaintiffs have inadequately pled a § 10(b) violation, they cannot make a successful Section 20(a) claim."). But even if they had, the control-person claims still fail.

To state a claim under Section 20(a), Plaintiffs must plead facts showing "that the controlling person was in some meaningful sense a culpable participant in the fraud," which requires "plead[ing] with particularity facts giving rise to a strong inference that the defendant acted with . . . scienter." *See Fila* v. *Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 499 (S.D.N.Y. 2016). The Complaint here does not even try. Plaintiffs do not include ***any*** substantive allegations—whether relating to scienter or otherwise—about ***any*** specific Defendant. Instead, as discussed above, Plaintiffs merely lob in the boilerplate and conclusory allegations that "Defendants" as a group knew the supposed misstatements were false (AC ¶ 34)—without alleging the who, what, when, where, why, or how. That is insufficient. *See Greco*, 2022 WL 4226022, at *25 ("Group pleading of scienter runs afoul of the PSLRA's requirement that a plaintiff state with particularity facts giving rise to a strong inference [of scienter].").

Nor do Plaintiffs allege facts showing that any Defendant—let alone each—controlled the alleged misstatements at issue. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165, 167 (S.D.N.Y. 2012) (explaining that "officer or director status alone does not constitute control" and holding that an individual defendant could not be liable as a control person absent allegations that he "signed, drafted, approved, or confirmed a misleading statement"). Instead, Plaintiffs again resort to conclusions and group pleading—alleging only that (i) "[t]he Eqonex Individual Defendants possessed the power and authority to control the contents of Eqonex's SEC filings, press releases, and other market communications" and "were provided with copies of the [*sic*] Eqonex's SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected" (AC ¶ 34); and (ii) "[b]ecause of their positions of control and authority as senior officers and controllers of Eqonex, Defendants were able to, and did, control the contents of the various reports,

press releases and public filings which Eqonex disseminated in the marketplace during the Class Period" (*id.* ¶ 94).  These conclusory allegations are insufficient as to all Defendants:

**Defendants Hai and Farnell**.  Plaintiffs fail to allege that either individual "signed, drafted, approved, or confirmed" any of the alleged misstatements for the same reasons that Plaintiffs fail to allege that either was the "maker" of any of the alleged misstatements (*i.e.*, the timing of the individuals' appointments and the fact neither signed the two press releases as issue).

**Defendants Ling and Cemmell**.  Plaintiffs' inclusion of these individuals as Defendants borders on frivolous.  The Complaint alleges that (i) Defendant Ling "became CFO and a director of Eqonex on April 28, 2022" (*id.* ¶ 29); and (ii) Defendant Cemmell "was appointed Chief Corporate Affairs Officer of Eqonex on March 31, 2022" (*id.* ¶ 30).  Plaintiffs, however, do not even try to explain how these individuals could have controlled statements made on March 7 and March 17—**before either joined Eqonex**.  That pleading failure requires dismissal.  *See In re Philip Services Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 487 (S.D.N.Y. 2004) ("Control person liability attaches only to a person who was in control at the time that the liability . . . accrued.").

**Defendants Bifinity, Binance, and Zhao.**  Plaintiffs' allegations against these three Defendants are irresponsible at best.  The Complaint does not even try to allege any facts to show (or even suggest) that any of them controlled Eqonex's **public statements**.  Instead, Plaintiffs allege that they controlled **Eqonex** generally.  Specifically, the Complaint alleges that (i) because of its right to appoint a number of officers and nominate directors, "Bifinity (and, through Bifinity, Binance)" took "control of Eqonex" (AC ¶ 7); and (ii) "Bifinity is wholly controlled by Defendant Changpeng" Zhao, who was also "the co-founder and CEO of Binance" (*id.* ¶¶ 6, 32).

But just as an officer or director cannot be a control person through title alone, neither can a parent company or controlling shareholder (let alone a CEO or controlling shareholder of a

controlling shareholder). *See In re Flag Telecom Holdings, Ltd.*, *Sec. Litig.*, 352 F. Supp. 2d 429, 457-59, 469 (S.D.N.Y. 2005) (dismissing Section 20(a) claims against issuer's largest shareholder who had the power to appoint directors). If it were—and Plaintiffs were permitted to state a claim against Bifinity (let alone Binance and Zhao) based only on corporate control—then every parent company and every controlling shareholder (and their owners) of every public company would be at risk for securities-fraud liability. That is as wrong as it sounds.[6]

## III.   THE COMPLAINT FAILS TO ESTABLISH PERSONAL JURISDICTION

To sue a defendant before this Court, Plaintiffs must allege "facts that, if credited, would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc.* v. *American Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010). Group pleading is not permitted; rather, "[a] plaintiff must carry his burden with respect to each defendant individually." *Berdeaux* v. *OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021). Plaintiffs do not even try. The Complaint fails to allege general jurisdiction because it does not allege the domicile of any individual, nor the principal place of business or state of incorporation of any entity. *See Wilder* v. *News Corp.*, 2015 WL 5853763, at *5-6 (S.D.N.Y. Oct. 7, 2015). The Complaint does not allege specific jurisdiction because it lacks factual allegations showing that any Defendant engaged in relevant conduct in the U.S. *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (no jurisdiction where complaint "[did] not allege, concretely, that [defendant] played ***any*** role in making, proposing, editing, or approving . . . public filings in the [U.S.]" (emphasis in original)).

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint with prejudice.

---

[6] Even if mere ownership or control of the issuer were sufficient (it is not), Plaintiffs would have the same timing problem as to these three that they have as to Defendants Hai and Farnell—the Bifinity appointees who started at Eqonex on March 17 and, thus, could not have controlled the March 7 or 17 statements.

Dated: New York, New York
January 12, 2024

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:    */s Samson A. Enzer*
       Samson A. Enzer
       Edward N. Moss
       Victoria H. Yuhas
       32 Old Slip
       New York, NY 10005
       (212) 701-3000

*Counsel for Defendants Binance, Bifinity, Jonathan Farnell, Daniel Ling, Almira Cemmell, Yu Helen Hai, and Changpeng Zhao*