# Exhibit 4

SC 13D 1 d259398dsc13d.htm SCHEDULE 13D

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## SCHEDULE 13D

**Under the Securities Exchange Act of 1934**
**(Amendment No.    )\***

---

# EQONEX LIMITED
**(Name of Issuer)**

**Ordinary shares, no par value per share**
**(Title of Class of Securities)**

**Y2074E109**
**(CUSIP Number)**

**Yu Helen Hai**
**c/o Bifinity UAB**
**Technopolis Beta Vilnius Business Centre**
**J. Balcikonio str. 3, LT-08247**
**Vilnius, Republic of Lithuania**

**Telephone: +370 613 60 184**
**(Name, Address, and Telephone Number of Person Authorized to Receive Notices and Communications)**

**April 19, 2022**
**(Date of Event which Requires Filing of this Statement)**

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box  ☐.

**Note**: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See § 240.13d-7 for other parties to whom copies are to be sent.

\*    The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

(f)    create or permit to subsist any security over any of its assets;

(g)    (i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by the Issuer or any subsidiary of the Issuer;

    (ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

    (iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

    (iv)    enter into any other preferential arrangement having a similar effect, in circumstances where the arrangement or transaction is entered into primarily as a method of raising financial indebtedness or of financing the acquisition of an asset;

(h)    equity issuances other than in connection with certain existing commitments of the Issuer or for the sole purpose of and contemporaneously with repaying a tranche of the Loan in an amount not exceeding the amount required to repay such tranche of the Loan on its maturity date and (in the case of the repayment of the final tranche of the Loan) to cover the Issuer's subsequent working capital requirements;

(i)    payment or award of any bonus to staff or payment of any extraordinary compensation unless recommended to the Issuer's Nomination and Compensation Committee by the Issuer's chief executive officer and chief financial officer and subsequently approved by such committee; and

(j)    prepayment of all of any part of the Loan other than as expressly permitted by the terms of the Convertible Loan Agreement.

The source of the funding for the Loan is cash flow generated by the business of Bifinity UAB.

**Item 4**    **Purpose of Transaction**

The information set forth in Items 3, 5 and 6 of this Schedule 13D is incorporated by reference in its entirety into this Item 4.

Commencing in August 2021, the Reporting Persons, their affiliates and their respective representatives have engaged, and intend to continue to engage from time to time, in discussions with the Issuer's management and/or Board, including any committees of the Board, and/or their respective advisors, regarding, among other things, the Issuer's business, strategies, management, governance, operations, performance, financial matters, capital structure, corporate expenses, prospects, status of projects, market positioning and strategic and other transactions. In particular, the Reporting Persons have engaged in discussions regarding a potential business combination of Bifinity UAB and the Issuer, including through a merger or the Issuer's acquisition of all of the issued and outstanding share capital of Bifinity UAB in exchange for the issuance of ordinary shares to Changpeng Zhao ("Mr. Zhao") or a holding company owned by him (the "Proposed Business Combination"). Bifinity UAB engages in the provision of cryptocurrency related services, including services for the conversion of fiat currencies into cryptocurrencies and vice versa, operation of digital wallets and currency custody and storage services. It is part of the Binance group and the official fiat-to-crypto payments provider for Binance (a leading blockchain ecosystem and cryptocurrency infrastructure provider). The Issuer offers regulatory-focused trading services centered around the Eqonex crypto exchange, digital asset investment solutions including an asset manager together with the pending launch of exchange traded products and structured products, and Digivault Limited, an FCA-regulated high security crypto and digital asset custody solution. The Reporting Persons and the Issuer have evaluated and discussed that the businesses of Bifinity UAB and the Issuer are complementary to each other and that combining such businesses could create significant business opportunities and enhance shareholder value.

The Reporting Persons, their affiliates, the Issuer and their respective representatives, including their respective outside legal counsels, have engaged and may continue to engage in discussions regarding the commercial and legal terms of the Proposed Business Combination and the terms of the definitive agreements for such transaction, including the transaction structure, the valuation of the respective parties and other terms and conditions, as well as the nature and scope of any business cooperation between the Issuer and other entities within the Binance group if the Proposed Business Combination is completed, but the parties have not reached any definitive binding agreement. The Convertible Loan Agreement provides, however, that no later than three calendar months following the date of such agreement, Bifinity UAB and the Issuer shall discuss in good faith a merger (or similar process) between Bifinity UAB and the Issuer such that the shareholder of Bifinity UAB would ultimately own between 98% and 98.5% of the entire issued share capital of the Issuer. Such provision does not obligate Bifinity UAB or the Issuer to enter into definitive binding agreements or complete the Proposed Business Combination on such terms or at all or to engage in any other transaction. No assurance can be provided as to if or when the parties may enter into any definitive binding agreements in connection with the Proposed Business Combination and, if the parties enter into definitive binding agreements, if or when the completion of such transaction will occur. If the parties enter into definitive binding agreements, completion of the Proposed Business Combination will be subject to obtaining any necessary regulatory approvals and other closing conditions. If the Proposed Business Combination is completed, the Reporting Persons intend to maintain the Issuer's listing on the Nasdaq Stock Market and the registration of its ordinary shares under the U.S. Securities Exchange Act of 1934 for the foreseeable future, although the Reporting Persons would in such case continue to evaluate their investment in the Issuer and their future plans with respect to the Issuer and reserve the right to change such intention.

The Loan was provided to the Issuer for working capital purposes and to enhance the management and Board of the Issuer through the right to appoint representatives of Bifinity UAB to the positions of chief executive officer, chief financial officer and chief legal officer and to the Board, while the parties continue to engage in non-binding discussions regarding the Proposed Business Combination and ways to maximize business synergies between the two businesses and capitalize on opportunities to cooperate and further expand their businesses. In connection with the foregoing, the Reporting Persons, their affiliates and their respective representatives have engaged and may, from time to time in the future, engage in discussions with current or prospective holders of Ordinary Shares, industry analysts, existing or potential strategic partners, acquirers or competitors, financial sponsors, investment firms, investment professionals, capital or potential capital sources (including co-investors), operating and other consultants and advisors and other third parties regarding such matters (in each case, including with respect to the Proposed Business Combination and providing or potentially providing capital to the Issuer or to existing or potential strategic partners of the Issuer) as well as other matters set forth in clauses (a)-(j) of Item 4 of this Schedule 13D. These discussions have encompassed, and the Reporting Persons expect will encompass, a broad range of matters relating to the Issuer, including, among other things, the Issuer's business, operations, finances, management, organizational documents, ownership, capital and corporate structure, corporate governance, the Board and committees thereof, strategic alternatives and transactions.

Given that the above-mentioned discussions are non-binding, there can be no assurance that the Proposed Business Combination, any potential alternative transaction, any components thereof, or any transaction at all, will be implemented. If the Proposed Business Combination or any similar transaction is not consummated, the Reporting Persons and/or their affiliates may to continue to participate in and influence the affairs of the Issuer, including as a shareholder of the Issuer if Bifinity UAB converts all or any part of the Loan or otherwise acquires any other Ordinary Shares, and may determine, from time to time, to engage in any of the events set forth in Items 4(a) through (j) of Schedule 13D.

The Reporting Persons, their affiliates and their respective representatives have exchanged, and intend to continue to exchange, information with the Issuer or other persons or entities pursuant to confidentiality or similar agreements. The Reporting Persons intend to consider, explore and develop plans, make proposals and negotiate agreements with respect to or relating to, among other things, the foregoing matters. The Reporting Persons may also take steps to explore or prepare for various plans, proposals or actions, or propose transactions, regarding any of the foregoing matters, before forming an intention to engage in any such plans, proposals or actions or proceed with any such transactions.

If Bifinity UAB converts all or any portion of the Loan into Ordinary Shares or the Reporting Persons acquire any other Ordinary Shares, the Reporting Persons intend to review their investment in the Issuer on an ongoing basis. Depending on various factors, including, without limitation, the outcome of any discussions referenced above, the Issuer's business, financial position, results, strategic direction or prospects or any strategic alternatives or transactions, actions taken by the Issuer's management or the Board, price levels of the Ordinary Shares, other investment opportunities available to the Reporting Persons, conditions in the securities, loan or bond markets, general economic or industry conditions or any changes in law or regulations, the Reporting Persons may in the future take such actions with respect to any investment in the Issuer as they deem appropriate, including, without limitation, the actions and matters described in the preceding paragraphs, acquiring, or causing to be acquired, additional Ordinary Shares (including through conversion of the Loan), including, without limitation, disposing of, or causing to be disposed, some or all of the Ordinary Shares beneficially owned by them, in the public market, in privately negotiated transactions or otherwise, providing additional debt financing or other forms of capital to the Issuer or to potential strategic partners or acquirers of the Issuer, pledging their interest in any securities of the Issuer as a means of obtaining liquidity or as credit support for loans or other extensions of credit, entering into strategic or other transactions involving the Issuer, its assets or securities or its subsidiaries and one or more of the Reporting Persons and/or their affiliates and/or other shareholders of the Issuer, or forming, making or undertaking other purposes, plans or proposals regarding the Issuer or any of its securities or its subsidiaries, businesses or assets. If the Reporting Persons were to acquire equity securities of the Issuer (including through conversion of the Loan) or other instruments convertible into or exercisable for equity securities of the Issuer, the Reporting Persons' ability to influence the Issuer's management, the Board or the policies of the Issuer may increase.