**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BIN LI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EQONEX LIMITED, BINANCE GROUP, BIFINITY UAB, JONATHAN FARNELL, DANIEL LING, ALMIRA CEMMELL, YU HELEN HAI, and ZHAO CHANGPENG,<br><br>Defendants. | **Case No. 1:23-CV-03346-GHW** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................................... 2

III.   ARGUMENT ...................................................................................................................... 7

    A.   Legal Standard for Evaluating Defendants' Motion ............................................... 7

    B.   The Complaint Pleads that Defendants were "Makers" of False and
    Misleading Statements ............................................................................................ 7

    C.   The Complaint Adequately Pleads Falsity ............................................................... 9

    D.   The Complaint Adequately Pleads Scienter ........................................................... 14

        1.   The Complaint Pleads Defendants' Motive and Opportunity ................... 16

        2.   The Complaint Pleads Strong Circumstantial Evidence of
        Recklessness ............................................................................................. 17

    E.   The Complaint Adequately Pleads Loss Causation ............................................... 18

    F.   The Complaint Adequately Pleads Control Person Liability ................................. 20

    G.   The Complaint Establishes Personal Jurisdiction Over Each Defendant ............. 22

IV.   CONCLUSION .................................................................................................................. 24

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)........................................................................................ 24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023)..................................................... 10, 11, 12, 13

*Altimeo*,
19 F.4th .................................................................................................................. 12

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).................................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................. 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................................... 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................. 7

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ......................................................... 10, 13

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)..................................................................................... 20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................ 18

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..................................................................................... 16

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)..................................................................................... 17

*Faulkner v. Verizon Commc'ns, Inc.*,
156 F. Supp. 2d 384 (S.D.N.Y. 2001)...................................................................... 12

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................ 15, 16, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................. 19

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000).................................................................................................. 14

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010).......................................................................... 21, 22

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................................. 22

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................................................. 22

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017).................................................................................. 23

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)................................................................................................... 7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)............................................................................ 20, 21

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) .......................................................................................... 15, 16

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021)................................................................... 10

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)..................................................................................... 9

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016)................................................................................................... 8

*In re Symbol Technologies, Inc. Sec. Litig.*,
   No. 05-CV-3923, 2013 WL 6330665 n.3 (E.D.N.Y. Dec. 5, 2013) ................................... 18

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................................ 19, 20

*In re Tronox, Inc. Sec. Litig.*,
   769 F. Supp. 2d 202 (S.D.N.Y. 2011).................................................................................. 21

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020)................................................................................... 8

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) .......................................................................................... 7, 11

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)......................................................................................................... 7, 8

*Kelleher v. ADVO, INC.*,
2008 WL 11376597 (D. Conn. Apr. 28, 2008).......................................................................... 9

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................................ 14

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
708 F. Supp. 2d 334 (S.D.N.Y. 2010)..................................................................................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)............................................................................................................... 10

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................................ 7, 17

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).................................................................................................. 10

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)................................................................................................... 13

*S.E.C. v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996)................................................................................................. 20

*S.E.C. v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................................................... 22

*Stratte-McClure v. Morgan Stanley*,
784 F. Supp. 2d 373 (S.D.N.Y. 2011)....................................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...................................................................................................... 15, 18

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp ., Inc.*,
2014 WL 3569338 (E.D.N.Y. July 18, 2014)........................................................................ 22

**Statutes**

15 U.S.C. § 78t(a) ................................................................................................................... 20

15 U.S.C. § 78u-4(b)(1) and (b)(2) ............................................................................................ 7

**Rules**

Fed. R. Civ. P. 15(a) ................................................................................................................ 24

**Regulations**

17 C.F.R. § 240.12b-2 ............................................................................................................. 20

Lead Plaintiff Bin Li and named plaintiffs Kreig Kinnaman and Jaime Chaves ("Plaintiffs") oppose Defendants' motion to dismiss ("Motion") the Amended Class Action Complaint ("Complaint") (Dkt. No. 47).[1]

## I.    PRELIMINARY STATEMENT

Banned by United Kingdom ("UK") authorities from any regulated activity in the UK, Defendants and Binance sought to return through a back door. They found it by taking control of Eqonex ("Eqonex" or "Company") in exchange for a $36 million loan, duping investors that Binance would grow the Company and potentially even merge with it. The truth, however, was that all Defendants wanted was Digivault, one of Eqonex's four operating units, with a license to operate in the UK. Once in control of Eqonex, Defendants shut down the operating unit earning 79% of Eqonex's revenue and fully took over control of Digivault, leading the Company towards bankruptcy.

All of Defendants' actions were in furtherance of its goal. Bifinity's $36 million loan to Eqonex and its Strategic Partnership with Eqonex were executed for one reason—to gain control of Digivault. All of Defendants' assurances to the market about merging with Eqonex and planning a sustainable, long-term partnership were empty words Defendants never intended to fulfill with

---

[1] Defendants Jonathan Farnell ("Farnell"), Daniel Ling ("Ling"), Almira Cemmell ("Cemmell"), and Yu Helen Hai ("Hai") are referred to herein as the "Eqonex Individual Defendants," and, with Defendant Zhao Changpeng ("Changpeng"), the "Individual Defendants." The Individual Defendants, Binance Group ("Binance"), and Bifinity UAB ("Bifinity") are referred to herein collectively as the "Defendants." Citations to the Complaint are "¶__." Citation to Defendants' Memorandum of Law in support of their Motion are "DBr __."

actions. Instead, Defendants immediately set out to re-enter the UK market while letting Eqonex collapse. When Eqonex revealed that it was in breach of the loan agreement with Bifinity, a breach that was inevitable, the die was cast, and Defendants had achieved their goal. Binance got what it wanted, Eqonex went bankrupt, and investors were damaged by Defendants' fraud and manipulation. The Court should deny Defendants' Motion in its entirety.

## II.    STATEMENT OF FACTS

Eqonex, formerly known as Diginex, was listed via a Special Purpose Acquisition Company ("SPAC") on NASDAQ on October 1, 2020. Forbes described Diginex as "The First Crypto and Digital Asset Exchange To Go Public In The U.S." As the first publicly traded crypto exchange, Diginex could raise transparency and compliance standards in a field often marked by troubled relationships with financial regulators. ¶36. In March 2022, as the Class Period began,[2] Eqonex operated four business lines: Custody, Asset Management, Brokerage, and the Exchange. ¶37. Eqonex's Custody business was comprised of Digivault, an institutionally focused, secure digital asset custodian. In May 2021, Digivault had received approval from the UK Financial Conduct Authority ("FCA") to register as a custodian wallet provider under the Money Laundering, Terrorist Financing and Transfer of Funds (Information of the Payer) Regulations 2017 (MLR 2017), as amended by the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, becoming a regulated digital asset custodian in the UK. ¶38. Eqonex's Exchange business offered the trading of virtual currencies and their respective derivatives. ¶41.

Binance, founded in 2017, is an online exchange where users can trade cryptocurrencies. It operates the largest bitcoin exchange and altcoin crypto exchange in the world by volume. ¶42. Binance launched Binance Custody in December 2021 to offer storage security

---

[2] The Class Period is between March 7, 2022 and November 21, 2022, inclusive. ¶2.

and liquidity solutions for institutions to manage digital assets. ¶43. On March 7, 2022, it launched Bifinity, which engages in the provision of cryptocurrency-related services and acts as Binance's official fiat-to-crypto payments provider. ¶44.

On June 26, 2021, the FCA ordered Binance to stop all regulated activity in the UK over worries about weak consumer protections, amid a wider crackdown on the cryptocurrency industry's potential role in fraud and money laundering. ¶45. Other regulators acted as well. Also in June 2021, Japan's Financial Services Agency, that country's financial regulator, warned consumers that Binance was not registered to do business in Japan and was operating there without permission. In August 2021, Binance said it would restrict Hong Kong users from trading derivative products, in response to regulator pressure there. In April 2021, Germany's financial watchdog, the Federal Financial Supervisory Authority, warned investors that Binance may have violated securities rules by allowing non-US users to trade tokenized versions of some US stocks by failing to issue a prospectus detailing its offering of the assets. Then, in June 2023, the SEC sued Binance and Defendant Changpeng personally, alleging that for years, the company had acted in "blatant disregard" of US securities laws. The charges included operating unregistered exchanges, broker-dealers, and clearing agencies, misrepresenting trading controls and oversight on the Binance US platform, and the unregistered offer and sale of securities. ¶46.

On March 7, 2022, before markets opened, Eqonex issued a press release announcing a Strategic Partnership with the newly launched Bifinity, stating that Bifinity would advance a $36 million convertible loan to Eqonex, and that the companies would "work together to maximize business synergies created by this new strategic relationship and capitalize on opportunities to cooperate and further expand their business." ¶47. The press release disclosed that the Strategic

3

Partnership would "initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the Eqonex Exchange, and expanding Bifinity's geographical footprint through Eqonex's licensing framework." ¶48. Both companies would "continue to engage in non-binding discussions to explore potential merger opportunities, subject to regulatory approval." ¶48. Bifinity would have the right to appoint Eqonex's Chief Executive Officer, Chief Financial Officer, and Chief Legal Officer as well as nominate two seats on Eqonex's Board of Directors ("Board"). ¶49. Bifinity also gained over 24.9% of the share charge of Digivault. ¶12. On this news, Eqonex's share price increased over 22%, from a closing price of $1.46 on March 4, 2022 to a $1.79 closing price on March 9, 2022, over multiple days of trading. ¶51.

That same day, March 7, 2022, the FCA issued a statement expressing concern about the Strategic Partnership between Eqonex and Bifinity. The FCA stated that it was aware of statements by Eqonex and Binance confirming that a member of the Binance group called Bifinity would advance a $36 million loan to Eqonex. It further stated that the FCA did not have powers to assess the fitness and propriety of the new beneficial owners or the change in control before the transaction was completed, and reiterated that it had previously published information expressing concerns about Binance and banned it from undertaking regulated activities without written consent of the FCA. The FCA noted that "[t]his requirement was put in place because, in the FCA's view, Binance Markets is not capable of being effectively supervised." ¶52.

Indeed, Binance and its executives consistently acted to subvert financial regulators. For example, in March 2023, CNBC reported that between 2021 and 2023, Binance ran a Discord server and a Telegram group in which Binance employees and Binance-trained volunteers shared techniques with users in China to evade Binance's "Know Your Customer," residency and

4

verification systems in order to trade cryptocurrency in violation of a 2021 ban by China. ¶64. Similarly, the SEC alleged in its lawsuit against Binance and Defendant Changpeng that for years, Binance encouraged certain US-based customers to submit false Know Your Customer information so that it could operate as an unlicensed securities exchange in the United States. ¶65.

Binance's Strategic Partnership with Eqonex was also not its only attempt to enter UK markets despite the FCA ban. In February 2022, Binance entered a partnership with the FCA-approved, London-based payments provider Paysafe, which created the potential for Binance users to deposit pounds sterling via Paysafe through its Faster Payments Service. At the time, the FCA reiterated its concerns about Binance, but stated it had limited powers to object to the arrangement with Paysafe. ¶66.

On March 17, 2022, Eqonex announced that Bifinity had appointed its new CEO and two new members to its Board. Bifinity appointed Defendant Farnell, also CEO of Bifinity and Binance's head of operations for the UK as Eqonex's new CEO, Defendant Ling, Bifinity's Director of Strategy, as Eqonex's CFO, and Defendant Cemmell, Special Projects Lead for Bifinity, as Eqonex's Chief Corporate Affairs Officer. Bifinity appointed Defendant Farnell and Defendant Hai, Bifinity's President and the head of the NFT and fan token platforms of Binance and Binance's Charity Foundation, to the Eqonex board of directors.[3] ¶53. The press release announcing the appointments stated that "[a]s CEO, Jonathan will play an instrumental role in fast-tracking the collaboration between both businesses…, [and] Bifinity will develop ways to leverage the Eqonex Exchange as an alternative trading platform[.]" *Id.* On this news, Eqonex's share price

---

[3] Ling replaced Hai on the Board on April 28, 2022.

increased over 32%, from an open of $1.62 on March 17, 2022 to a close of $2.15 on March 21, 2022, over multiple days of trading. ¶55.

In August 2022, the FCA announced that as of August 11, it had expanded its change in control regime to include FCA-registered cryptoasset businesses. From August 11, 2022, a person or entity wishing to acquire "control" of an FCA-registered cryptoasset business, directly or indirectly, would have to receive prior FCA approval. ¶57. A "controller" would mean a person or entity who owns more than 25% of the shares or voting rights in the crypto business. *Id.* This change was not a surprise. It was initially laid as a draft statutory instrument in the UK Parliament on June 15, 2022, but had already been anticipated in the industry. ¶58. As noted above, Bifinity controlled 24.9% of Eqonex's share charge. ¶12.

On August 15, 2022, the Company issued a press release announcing the closure of the Exchange, which had accounted for 79.9% of its revenues in the financial year ending March 31, 2022. ¶¶59, 61. On this news, Eqonex's share price fell over 18% to close at $0.637 on August 17, 2022. ¶60. In connection with the closure of the Exchange, in accordance with the loan agreement, Eqonex agreed to increase Bifinity's share charge of Digivault under the loan agreement from 24.9% to 100%. In other words, Bifinity took over Digivault entirely as Eqonex lost the source of nearly 80% of its revenue. ¶12.

Even as Eqonex was closing its Exchange, Defendants assured investors that doing so would "improve the Company's financial position" and was "the right decision to deliver shareholder value" in order for resources to be allocated to the "high-potential" Asset Management and Custody businesses. ¶61. But on November 21, 2022, the Company disclosed that Eqonex was in breach of the Loan Agreement with Bifinity. It further stated that based on its then-current working capital forecast, it may not have sufficient financial resources to satisfy its working capital

6

requirements for a period of twelve months, casting "significant doubt" on Eqonex's ability to continue as a going concern. ¶62. On this news, Eqonex's share price plummeted over 48% to close at $0.141 on November 22, 2022. ¶63. Eqonex has since filed for judicial management pursuant to the Insolvency, Restructuring and Dissolution Act 2018 of Singapore. ¶25.

## III.    ARGUMENT

### A.    Legal Standard for Evaluating Defendants' Motion

In ruling on a motion to dismiss under Rule 12(b)(6), a court accepts all well-pleaded allegations as true, drawing reasonable inferences in favor of plaintiffs. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 692 (2d Cir. 2009); *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145, 147 (2d Cir. 2021). A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiffs pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a §10(b) claim must "'specify'" each false statement, explain "'the reason or reasons why the statement [was] misleading,'" and "state with particularity facts giving rise to a strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)).

### B.    The Complaint Pleads that Defendants were "Makers" of False and Misleading Statements

Defendants' argument that Plaintiffs are suing the wrong people and entities because they are not "makers" of false statements under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), DBr 20-22, is without merit.

As Defendants note, *Janus* holds that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. at 142. In *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016), interpreting *Janus*, the Second Circuit denied summary judgment, holding that there was a material question of fact regarding whether Pfizer, which participated in a co-promotion agreement with two other companies and worked together with one on preparing a public relations document that directed employees regarding how to answer media questions, was a maker with ultimate authority—even as the document at issue did not come from Pfizer and the persons who actually interacted with the media worked for co-promoters, and not for Pfizer. Accordingly, *Janus* does not mean that only the signer or speaker of a statement can be its maker. "Whether a defendant is the 'maker' of the misstatement may depend on inferential or circumstantial evidence." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 261 (S.D.N.Y. 2020).

In this case, inferential and circumstantial evidence show that Defendants controlled Eqonex's public statements at all times during the Class Period. Eqonex announced that it had entered into the Strategic Partnership on March 7, 2022. ¶47. Under the terms of the Strategic Partnership, Bifinity would have the right to appoint a new CEO, CFO, and CLO, and nominate two new directors. ¶49. This meant that by March 7, 2022, Bifinity—and through Bifinity, Binance—controlled Eqonex. As in *Pfizer*, the responsibility of Bifinity, its CEO Defendant Farnell, CFO Defendant Ling, Special Projects Lead Defendant Cemmell, President Defendant Hai, and sole shareholder Defendant Changpeng for the contents of Eqonex's March 7, 2022 statement is therefore plausible on its face. Moreover, it is undisputable that after the Eqonex Individual Defendants joined Eqonex's executive team and board, they had a duty not to mislead the Company's shareholders. That included a duty to correct any statements to the market that

were false so that they could not continue to mislead investors.[4] They did not, rendering them liable. *See Kelleher v. ADVO, INC.*, 2008 WL 11376597, at *2 (D. Conn. Apr. 28, 2008) (defendants were liable for failing to correct prior false statements).[5]

### C.    The Complaint Adequately Pleads Falsity

Defendants made two materially false claims: that the Strategic Partnership would support Eqonex, and that there was the possibility of a merger between Eqonex and Bifinity. In reality, the Strategic Partnership was simply a means for Binance, through Bifinity, to gain control of Eqonex and its FCA-regulated operating unit Digivault, and Defendants never intended to merge with Eqonex, but only to use it to circumvent the FCA. ¶67. Defendants argue that their statements

---

[4] The June 3, 2022, report from Chardan Research stating that "[i]n our view, the company's strategic partnership with Bifinity, a division of Binance, limits potential downside[,]" shows that investors continued to trust and rely upon Defendants' false and misleading statements from March 7, 2022 and March 17, 2022. ¶56. As Eqonex executives and directors, the Eqonex Defendants were duty-bound to correct those statements.

[5] Defendants' citations to *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 384 n.4 (S.D.N.Y. 2011) and *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.14 (S.D.N.Y. 2014) are inapposite. In *Stratte-McClure*, the Court held that defendants could not be held liable for statements that were issued ***after they left the company***. By contrast, Plaintiffs plead claims against the Individual Defendants, Bifinity, and Binance for statements that Eqonex made while they controlled Eqonex. In *Lululemon*, the complaint did not include any allegations concerning one defendants' involvement in certain statements. Here, the Complaint alleges that the Individual Defendants, Bifinity, and Binance controlled Eqonex and therefore controlled its public statements. ¶67.

about the Bifinity's $36 million loan to Eqonex are inactionable because they are literally true, that the Complaint does not sufficiently allege the falsity of their statements about Binance and Bifinity's intentions in connection with Eqonex, and that some of those statements are puffery or forward-looking. Defendants' arguments miss the mark, ignoring the well-settled law that context matters.

The Court will examine the Complaint's allegations holistically, in context. *See, e.g., Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *8 (S.D.N.Y. Jan. 5, 2023) (denying a motion to dismiss, noting that the Second Circuit instructs district courts to weigh potentially fraudulent statements together and in context, not in isolation); *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (internal quotation omitted) (courts ask if "defendants' representations, taken together and in context, would have misled a reasonable investor"). Omissions are material when "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). Taken together, and drawing reasonable inferences in Plaintiffs' favor, the Complaint adequately alleges that Defendants misled Eqonex investors about the purpose of the Strategic Partnership.

Statements concerning the purpose of a merger or similar transaction are actionable. In *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *3 (S.D.N.Y. Sept. 30, 2021), denying dismissal, the court ruled that a defendant's lies about its present intentions concerning a corporate acquisition can be actionably false. In *Kirkland* the company misled investors by explicitly downplaying the possibility of asset acquisitions while it was actively considering acquiring a company that did not meet its expressed standards for an asset. In *Altimeo Asset Mgmt.*

10

*v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 361–362 (S.D.N.Y. 2023), denying dismissal, the Court held that having chosen to disclose the reasons for a merger, defendants were obligated to describe those reasons truthfully and completely, holding that defendants' omission of a relisting plan from a list of reasons for a merger rendered that list materially misleading. 663 F.Supp.3d at 362.

The Complaint pleads that Defendants never intended to merge Bifinity with Eqonex or to carry on its business as a going concern at all—that the $36 million "loan" and the Strategic Partnership (with its stated potential for a future merger) were pretext for Binance and Bifinity to gain access to an FCA regulated custodian, as a way to circumvent the FCA's ban of Binance. While Defendants call this a conspiracy theory, DBr 2, considering the facts holistically, it is anything but; rather it is a reasonable inference, one which the Court should draw in Plaintiffs' favor. *See Textron*, 14 F.4th at 147 (reversing dismissal for failure to draw reasonable inference in plaintiff's favor on falsity).

The Complaint alleges that, to circumvent its FCA ban, Binance spent $36 million to access Digivault, which was a UK FCA regulated custodian. ¶66. It provides, as context, examples of Binance attempting to circumvent regulators in China and the United States, demonstrating a pattern. ¶¶64-66. That $36 million payment gave Defendants full control of Eqonex by allowing them to take over its executive suite. Having gained access to the regulated UK market through Digivault, Defendants dismantled Eqonex within months, shutting down the business that had been responsible for 79.9% of its revenue in the previous financial year. ¶59. Defendants' shutdown of the Exchange business also enabled them to increase Bifinity's share charge of Digivault to 100%. ¶12. These facts raise a plausible inference that Defendants had only one purpose for taking control of Eqonex and had accomplished it: taking control of Digivault and re-entering the UK regulated

market. If the $36 million payment from Bifinity to Eqonex was a loan that Defendants anticipated would be repaid, it would make no sense for them to shut down the Company's primary source of revenue.[6] Having accomplished their goal of taking over Digivault immediately through the initial $36 million payment and takeover of Eqonex's executive suite, spending more money to carry out a merger was completely unnecessary, raising the plausible inference that Defendants never intended for a merger to take place. Accordingly, the Complaint sufficiently pleads that Defendants' statements concerning the purpose of the Strategic Partnership and the $36 million payment were materially false. As in *Altimeo,* Defendants misled concerning the reason for a material transaction. *See Altimeo*, 19 F.4th at 145 (inferring falsity from circumstantial evidence, and explaining that such evidence is sufficient to plead falsity if it explains how and why the statement at issue was misleading when made).

*Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384 (S.D.N.Y. 2001), *see* DBr 10, is distinguishable. There, Verizon actually committed itself to a merger, with potential financial consequences. That fact raises the inference that *Verizon* actually intended to carry out a merger and changed their minds because of market conditions. *Id.* at 399. Here, the Complaint alleges, ***nothing changed*** with respect to market conditions or business strategy**.** The allegations raise a reasonable inference that merger discussions (if they ever took place) were a ruse because the terms of the initial Strategic Partnership immediately, fully accomplished Defendants' goal, and

---

[6] Defendants' argument that Eqonex's SEC filings gave investors the ability to determine for themselves whether the loan was likely to be repaid or was sufficient for Eqonex to stave off bankruptcy is a red herring. *See* DBr at 7-8. Eqonex's public financial disclosures did not contemplate its shuttering the operation that yielded nearly 80% of its revenue. Nor did analysts covering the Company. For example, on June 3, 2022, Chardan Research analyst report noted that "[i]n our view, the company's strategic partnership with Bifinity, a division of Binance, limits potential downside." ¶56.

they had no reason to invest any additional resources. ¶67. As in *Kirkland* and *Altimeo*, Defendants materially misled investors concerning their intentions for mergers and acquisitions.

Further, because, in context, Defendants' statements misled, contrary to Defendants' assertion, their literal truth is unavailing. *See* DBr 7 (arguing that the issuance of the $36 million loan was a true fact); DBr 8 (citing SEC filings to "confirm" that discussions about a potential merger continued for months); DBr 12 (standing by the truth of the statement that the Strategic Partnership would "support the Eqonex Exchange," ¶48). Courts evaluate material falsity by a statement's "ability to accurately inform rather than mislead prospective buyers," not by its literal truth. *Altimeo*, 663 F.Supp.3d at 361 (it is of no consequence that the stated reasons for the merger, viewed in isolation, are not pled to have been "untrue"); *Bishins*, 2023 WL 112558, at *8 (the literal truth of a statement did not cleanse a material omission).

The Complaint does not allege that Bifinity did not lend $36 million to Eqonex. Rather, it alleges that in the context of disclosing that loan, it was materially misleading to omit that Bifinity had no reasonable expectation of repayment or continuing partnership. Rather, Binity sought only to gain control over Digivault to circumvent the FCA ban. (¶50). That Defendants kept the exchange open for five months does not support that they truthfully intended to "strengthen" it, DBr 13, but that they were not yet ready to give up its revenue. Further, Defendants' reference to SEC filings to "confirm" that discussions about a potential merger continued for months, DBr 8, is entirely improper at the pleadings stage, and the Court should not consider those filings for the truth of the matter.[7]

_____

[7] *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (courts may take judicial notice of public records to determine what statements they contained, but not for the truth of the matter

13

Finally, Defendants' arguments that statements such as "Eqonex would initially focus on…strengthening the technology supporting the Eqonex Exchange" are puffery and forward-looking  and protected by cautionary language, DBr 14-15, are red herrings. The misstatements that Plaintiffs challenge do not depend on parsing statements about "strengthening [] technology." Defendants made two false statements about the Strategic Partnership supporting Eqonex, and about the possibility of a merger between Eqonex and Bifinity. In reality, the Strategic Partnership was simply a means to circumvent the FCA ban, gaining control of Eqonex and its access to the UK, and Defendants never intended to merge Eqonex with Bifinity. ¶67.[8] Accordingly, the Complaint adequately pleads falsity.

### D.    The Complaint Adequately Pleads Scienter

A complaint adequately pleads scienter when it alleges (i) facts showing that a defendant

---

asserted); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("[F]act-specific question[s] cannot be resolved on the pleadings."); *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented [in support of or] in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material.") (alteration and internal quotation marks omitted); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1006 (9th Cir. 2018) (finding an abuse of discretion in allowing SEC filings to contradict allegations)

[8] Defendants' argument that "Plaintiffs fail to explain how *not* merging would have given Binance a better chance of controlling Digivault than merging" (DBr 9) makes no sense. Binance gained control of Digivault through the Strategic Partnership; no additional steps were necessary. Defendants got everything they wanted in the initial $36 million transaction.

had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) (citation omitted). To determine the adequacy of a complaint's scienter allegations, courts engage in a comparative analysis. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007) (citation omitted). Courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). Considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" courts determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* A strong inference "need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences. *Id.* (citations omitted).

The absence of motive, while relevant, "is not fatal[.]" *Tellabs*, 551 U.S. at 325 (citation omitted). Indeed, "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* Recently, the Second Circuit clarified that while independent bases exist for pleading scienter, it is error not "to assess the total weight of the circumstantial allegations **together with** the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021) (emphasis in original). Thus, even if allegations of motive fail, alone, to establish a strong inference, courts must consider those allegations in their holistic analysis of scienter allegations. Here, the Complaint's allegations, considered together, support a strong inference of scienter for each defendant.

15

## 1.   The Complaint Pleads Defendants' Motive and Opportunity

There is no dispute that high-ranking officers have the opportunity to mislead investors. *See*, *e.g.*, *comScore*, 268 F. Supp. 3d at 553-54. The Complaint pleads that Defendants also had the motive to mislead, supporting a cogent and at least equally compelling inference of scienter.

Second Circuit courts must consider scienter allegations holistically and assess the total weight of circumstantial allegations of scienter together with motive allegations. *Hain Celestial Group*, 20 F.4th 131 at 137-38, *citing ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009) (the strength of circumstantial allegations required to plead scienter varies depending on whether there are also allegations of motive and opportunity). The Complaint pleads that Defendants were motivated to enter into the Strategic Partnership so they could circumvent the FCA ban and gain access to the regulated UK market through Digivault, which was already an FCA-regulated custodian. ¶67.

While the Strategic Partnership gave Defendants immediate actual control over 24.9% of the share charge of Digivault as well as the practical ability to direct Digivault from Eqonex's executive suite, that immediate change was not the end of the story. At the time Eqonex and Bifinity announced the Strategic Partnership, it was widely anticipated in the industry that the FCA would be expanding its change in control regime to include FCA-registered cryptoasset businesses. As a result, even though the FCA did not have the power to assess the Strategic Partnership in March 2022, Defendants knew that they would, and that Defendants would eventually have to obtain clearance for their takeover of Digivault. ¶¶57-58. Defendants' argument that "committing securities fraud would have done ***nothing*** to advance that supposed objective [of taking control of Digivault][,]" DBr 16, disregards that because of the anticipated UK regulatory expansion, Defendants were motivated to keep up the illusion that they were simply in a Strategic Partnership with Eqonex with the possibility of a merger so that they could work on convincing the FCA to

16

sanction a change in control of Digivault, which would then allow them to take a 100% share charge in Digivault and let Eqonex itself collapse. Such a motive goes well beyond motives possessed by virtually all corporate insiders. *Novak*, 216 F.3d at 307. By showing their hand immediately, particularly in light of the FCA's stated skepticism surrounding the transaction, ¶66, Defendants would have torpedoed their chances of convincing the FCA to grant clearance. By the time that the FCA announced that the long-anticipated regulatory change was effective, as of August 11, 2022, ¶¶57-58, Defendants had had months to convince the FCA and were ready to act.

### 2.    The Complaint Pleads Strong Circumstantial Evidence of Recklessness

The Complaint adequately pleads that Defendants acted with recklessness, alleging that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The Complaint specifically alleges that Defendants were not trying to acquire or even engage in a sustainable partnership with Eqonex, but rather using Eqonex to gain access to a market from which Binance had been banned. *See, e.g.,* ¶67.

Defendants' argument that "[t]he Complaint is devoid of anything to support Plaintiffs' fanciful theory that Defendants must have known that Binance had a master plan to use Digivault for its own purposes and hang the rest of Eqonex out to dry[,]" DBr 17, ignores that *each of the Defendants were acting on behalf of Binance to carry out its plan for Eqonex*. Bifinity was created for that purpose on the same day that Eqonex announced the Strategic Partnership, ¶27, and the Eqonex Individual Defendants, who were also Bifinity executives, took active control of the Company on behalf of Bifinity, Binance, and Defendant Changpeng. ¶¶28-32. As discussed above in detail, Defendants' public actions show that what Defendants call a "fanciful theory" is

17

actually a reasonable inference. Defendants' job was to carry out Binance's intentions, and raises the inference that they knew those intentions, and that they did not match Eqonex's public statements.

Defendants' argument that their pattern of subverting regulators that the Complaint alleges cannot support scienter allegations in this case mischaracterizes it as "unsubstantiated accusations about other events[.]" DBr 17. These events, reported by major news organizations and alleged by the SEC based on its investigation, ¶¶64-65, are not separate from Defendants' actions in this case but part of one larger course of conduct. This pattern further supports scienter. *See In re Symbol Technologies, Inc. Sec. Litig.*, No. 05-CV-3923, 2013 WL 6330665, at *10 n.3 (E.D.N.Y. Dec. 5, 2013) (a pattern of culpable conduct supports a strong inference of scienter).

Given these allegations, Plaintiffs have alleged the strong inference of scienter required under the PSLRA. Considering the allegations holistically, "a reasonable person would deem the inference of scienter at least as compelling as any opposing inference from the facts alleged." *Tellabs*, 551 U.S. at 323.

### E.    The Complaint Adequately Pleads Loss Causation

Defendants argue that the disclosures at the end of the Class Period are not corrective of prior misstatements. They are wrong, as those statements revealed Defendants' misstatements concerning their intentions with respect to Eqonex and Digivault.

Loss causation "is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007). A Complaint must merely provide "notice of what the relevant economic loss might be" and "what the causal connection might be between that loss" and the alleged misrepresentations. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). Thus, the complaint must allege that the "market reacted negatively to a corrective begin[ning] to leak out." *Dura,* 544 U.S. at 342.

18

A corrective disclosure need not be a "mirror image" of the materially false statement. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). The vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8. *See King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) ("[P]laintiffs need only meet the lesser Rule 8(a) standard when pleading loss causation.").

As discussed in the Falsity section, *supra*., the Complaint adequately pleads Defendants' true intention, which was not to merge with Eqonex or otherwise to strengthen it or benefit its shareholders, but to get access to Digivault and through it regain entry into the UK FCA regulated custodian business from which it had been banned.

As with falsity, Defendants refuse to consider context, instead arguing, similar to their falsity argument, that literally true statements cannot be corrected. *See* DBR 18-19. But in their proper context, the corrective disclosures lay bare Defendants' misstatements about their intentions. The August 15, 2022 press release, ¶¶59, 61, that Defendants were closing the source of 80% of Eqonex's revenue, relate to and correct Defendants' earlier misstatements about their intentions. Having achieved their goal of controlling Digivault, Defendants did not need to pretend anymore that they had lofty goals. After all, selling 80% of revenue generation rendered it virtually impossible to pay back the $36 million loan, and the market reacted accordingly.

The November 21, 2022 disclosure, ¶62, announcing that Eqonex was in breach of its loan agreement and might not continue as a going concern, similarly corrected Defendants' earliest failures to disclose their true intentions, and that they never intended to merge Bifinity with Eqonex or carry on as a going concern at all. These allegations suffice to meet the Rule 8(a) pleading standards. Defendants' reliance on *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) is misplaced. In *Take-Two*, there was no match in the subject of the false

19

statements and the alleged corrective disclosures, as the misstatement discusses the company's options grants, while the correction did not correct anything on that subject. *Id.* at 284. Here, both the misstatement and the correction are on the same subject: Bifinity's intentions with respect to Eqonex. The Complaint adequately pleads loss causation.

### F.    The Complaint Adequately Pleads Control Person Liability

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5, and that the Individual Defendants controlled Eqonex, Plaintiffs have adequately alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *comScore*, 268 F.Supp.3d at 556.

In order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation omitted). In addition to pleading a primary violation by Eqonex, described in detail *supra,* the Complaint pleads that each Defendant controlled Eqonex and was a culpable participants in its fraud. Defendants' arguments that the Complaint does not include particularized allegations showing that any of the Individual Defendants were culpable participants in the alleged fraud, or that they controlled Eqonex's materially false statements, DBr 22-25, fall short because the Complaint pleads each of their scienter.

Control over a primary violator may be established by showing that the defendant "possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Defendants cite *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005), which dismissed Section 20(a) claims against a company's largest shareholder, to argue

that a parent company or controlling shareholder cannot be a control person "through title alone." DBr 24-25. But Defendants misread *Flag*, which specifically distinguishes between ***influence*** (the role of a 30% shareholder with the power to appoint three out of nine of the company's directors, 352 F.Supp.2d 458) and ***control,*** which the Court notes requires only the ability to direct the actions of the controlled person, and not the active exercise thereof. *Id. Flag* therefore stands for the proposition that a parent company or controlling shareholder is a control person, while a large shareholder may or may not be. Moreover, the determination of whether an individual defendant was a controlling person is a "fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011). "A plaintiff must only show some indirect means of discipline … to plead control." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010).

The Complaint sufficiently pleads that each Defendant had the ability to direct Eqonex's actions and therefore actually controlled the Company. The Strategic Partnership granted Bifinity full control over Eqonex's executive management, as well as two seats on its Board. Bifinity executives took over the CEO, CFO, and Chief Corporate Affairs Officer roles. These Bifinity insiders had and exercised the power to shut down the business that generated nearly 80% of the Company's revenue. ¶59. The precise dates of their official appointments to Eqonex are irrelevant where Eqonex and Bifinity had already entered into the Strategic Partnership that established Bifinity's control of the Company; in reality, Eqonex could no longer act without Bifinity's direction or approval, which would inevitably mean the direction or approval of Bifinity's CEO (Defendant Farnell), Director of Strategy (Defendant Ling), Special Projects Lead (Defendant Cemmell), and President (Defendant Hai). ¶¶47, 28-31. Moreover, Bifinity was created on the same day that the Strategic Partnership was announced as an agent of Binance and Defendant

21

Changpeng in connection with the takeover of Eqonex and through it, Digivault, establishing these Defendants' control as well. ¶44.

Moreover, the Complaint sufficiently establishes that Defendants were culpable participants in the primary violation. W*aterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp ., Inc.*, 2014 WL 3569338, at *9 (E.D.N.Y. July 18, 2014) ("the pleading requirements for 'culpable participation' are satisfied by the same allegations that satisfy the scienter pleading requirements" for the primary violation). *American Intern.* Group, 741 F.Supp.2d at 535 (same); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004) ("allegations of scienter necessarily satisfy the [culpable participation] requirement"); *Smithtown Bancorp*, 2014 WL 3569338, at *9 (same). Having established each Defendants' scienter , the Complaint also adequately pleads their culpable participation.

### G.    The Complaint Establishes Personal Jurisdiction Over Each Defendant

This Court has personal jurisdiction over each of the Defendants. Eqonex was listed on a domestic exchange. ¶25. As officers and directors of a company who knew Eqonex was listed on a domestic exchange, and who in some cases personally contributed to public filings in the United States (*see, e.g.,* ¶¶48, 53, 59), Defendants engaged in fraudulent conduct knowing that prospective purchasers would likely be influenced by any false statements. Defendants, therefore, have "minimum contacts" with the United States. *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 255–56 (S.D.N.Y. 2013) (minimum contacts established where Defendants knew or had reason to know that false statements would be distributed to purchasers on a US exchange). Because their contacts with this forum rise to the level of "minimum contacts," Defendants have not, and will not in a motion to dismiss, defeat jurisdiction by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 641–45 (S.D.N.Y. 2017) (citations and quotations omitted). Further,

22

Defendants Binance and Zhao Changpeng have acknowledged minimum contacts with the U.S. because they did not contest personal jurisdiction in the ongoing SEC case against the two, or in the criminal action against them.[9]

Defendants' reliance on *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) to argue that the Complaint does not sufficiently allege that Defendants engaged in relevant conduct in the United States, DBr 25, is inapposite. In that case, the Court held that the complaint did not allege that the defendant at issue, a major shareholder of Braskem, played a role in making public filings. The Complaint's allegations of Defendants' takeover of Eqonex far exceeds the vague, conclusory allegation that the Court found insufficient in *Braskem*,[10] including that Defendants assumed control of Eqonex to circumvent a regulatory ban, ¶¶3, 52, 67, and that they took over its executive suite, ¶7.

Defendants had the requisite minimum contacts with the United States to support personal jurisdiction.

---

[9] Press Release, U.S. Securities and Exchange Commission, SEC Files 14 Charges Against Binance Entities and Founder Changpeng Zhao (June 5, 2023), https://www.sec.gov/news/press-release/2023-101; Press Release, U.S. Department of Justice, Binance and CEO Plead Guilty to Federal Charges in $4B Resolution (Nov. 21, 2023), https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

[10] "Odebrecht had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various statements and omissions which Lead Plaintiff contends are false and misleading." 246 F.Supp. 3d at 770.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.[11]

Dated: February 16, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
            lheifetz@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

---

[11] In the event the Court finds that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to amend, which, under Fed. R. Civ. P. 15(a), "shall be freely given when justice so requires." The Second Circuit requires courts to be especially liberal in granting leave to amend in cases of dismissed securities fraud claims. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (noting with regard to dismissal of plaintiffs' 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) [for failure to plead with particularity] are 'almost always' dismissed with leave to amend").

24