UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

BIN LI, *individually and on behalf of all others similarly
situated*,

                                      Plaintiff,

                    -v -

EQONEX LIMITED, BINANCE GROUP,
BIFINITY UAB, JONATHAN FARNELL,
DANIEL LING, ALMIRA CEMMELL, YU
HELEN HAI, ZHAO CHANGPENG,

                                 Defendants.

------------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

1:23-cv-03346-GHW

MEMORANDUM OPINION &
ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/18/2024

GREGORY H. WOODS, United States District Judge:

## I.  INTRODUCTION

In March 2022, Eqonex Limited ("Eqonex"), a Singapore-domiciled digital assets financial company, entered into a strategic partnership with Bifinity UAB ("Bifinity"), a payments technology company. The terms of the strategic partnership gave Bifinity significant influence over Eqonex's operations. When announcing the strategic partnership, Eqonex also announced that the two companies would continue discussing a potential merger. Five months after the strategic partnership began, Eqonex decided to close its virtual currencies exchange—its primary source of revenue—and Bifinity took full ownership of Eqonex's digital asset custodian business. Three months later, Eqonex found itself unable to repay its loan to Bifinity and told investors it had doubts about the company's ability to continue as a going concern. Eqonex's stock price collapsed shortly thereafter.

Plaintiffs brought this securities class action on behalf of themselves and other similarly situated investors who acquired Eqonex common stock. Plaintiffs claim that Bifinity entered into the strategic partnership merely to take advantage of Eqonex's financial hardship and acquire

Eqonex's U.K.-approved digital asset custodian. As a result, Plaintiffs claim that Defendants, in connection with this scheme, made false and misleading statements about their intentions to strengthen Eqonex and facilitate a merger, in violation of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. Defendants respond that Plaintiffs have failed to allege with particularity facts supporting the existence of such a scheme or supporting Defendants' scienter.

Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(2). Because Plaintiffs have not adequately pleaded that any Defendant planned for Eqonex to fail at the time that the strategic partnership with Bifinity was announced, Plaintiffs have not adequately pleaded that any of the allegedly misleading statements were made with scienter. For that reason, and for the other reasons described below, Defendants' motion to dismiss is GRANTED.

## II.    BACKGROUND

### A.    Facts[1]

#### 1.    The Parties

Eqonex is a Singapore-domiciled digital assets financial company.[2] Dkt. No. 39, Am. Compl. ¶ 4. Eqonex offered digital asset custodian services, asset management services, and brokerage services. *Id.* "Eqonex's [c]ustody business was composed of Digivault," a secure digital

---

[1] At the motion to dismiss stage, the Court accepts the following facts set forth in the Amended Class Action Complaint ("Amended Complaint"), Dkt. No. 39. Certain facts are also drawn from the Form 6-K documents filed with the SEC that contain the statements Plaintiffs allege to be false or misleading and that form the basis for this action. Dkt. Nos. 48-6, 48-7. Because Plaintiffs reference these documents in the Amended Complaint and rely on these documents for their claims, the Court may consider the facts contained therein for deciding a motion to dismiss. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("[The court] may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.").

[2] Eqonex was initially named as a defendant in this case, but Plaintiffs withdrew its claims against Eqonex in their Amended Complaint. *See* Dkt. No. 39. Therefore, the Court will consider all claims against Eqonex to have been dismissed. However, Plaintiffs still allege that Eqonex was a "primary violator" of Section 10(b) for purposes of Plaintiffs' Section 20(a) claims against the remaining defendants. Am. Compl. ¶ 82.

asset custodian. *Id.* ¶ 38. Eqonex also operated an exchange for trading virtual currencies and their derivatives (the "Exchange"). *Id.* ¶ 5. Income from the Exchange made up 79.9 percent of Eqonex's revenues in the fiscal year ending in March 2022. *Id.* ¶ 61. Eqonex was publicly listed on the NASDAQ in October 2020. *Id.* ¶ 36.

Binance is a large blockchain ecosystem and cryptocurrency infrastructure provider. *Id.* ¶ 26. Binance operates the largest bitcoin exchange in the world by volume. *Id.* ¶ 42. Bifinity is a payments technology company incorporated in the Republic of Lithuania. *Id.* ¶ 27. Bifinity is "a part of Binance as its official fiat-to-crypto payments provider." *Id.* Binance "launched Bifinity on March 7, 2022, the same day that Eqonex announced the strategic partnership with Bifinity." *Id.*

Zhao Changpeng is the sole shareholder of Bifinity and is the co-founder and Chief Executive Officer ("CEO") of Binance. *Id.* ¶ 32.

Jonathan Farnell is the head of Binance for the U.K. and is the CEO of Bifinity. *Id.* ¶ 28. Farnell became Eqonex's CEO and a member of Eqonex's board of directors on March 17, 2022. *Id.*

Yu Helen Hai "is the president of Bifinity as well as the head of the NFT and fan token platforms of Binance and the Binance Charity Foundation." *Id.* ¶ 31. Hai was appointed to serve as a member of Eqonex's board of directors on March 17, 2022. *Id.* She resigned from Eqonex's board on April 28, 2022. *Id.*

Daniel Ling "serves as Bifinity's Director of Strategy." *Id.* ¶ 29. Ling became Eqonex's Chief Financial Officer ("CFO") and replaced Hai on Eqonex's board of directors on April 28, 2022. *Id.*

Almira Cemmell became Eqonex's Chief Corporate Affairs Officer ("CCAO") on March 31, 2022. *Id.* ¶ 30. "Prior to that role, Cemmell was special projects lead for Bifinity." *Id.*

### 2. Regulations Constrain Binance's Operations in the United Kingdom

In May 2021, Eqonex's Digivault received approval from the United Kingdom's Financial Conduct Authority ("FCA") to register as an approved custodial wallet provider in the U.K. *Id.* ¶ 38.

Around the same time Digivault got off the ground in the U.K., regulators limited Binance's access to the market. On June 26, 2021, the FCA ordered Binance to stop all regulated activity in the U.K., citing concerns about consumer protection, fraud, and money laundering. *Id.* ¶ 45. As a result, "[s]ome of the U.K.'s largest banks, including Santander and Barclays . . . barr[ed] customers from sending money to the Binance exchange." *Id.* In response, Binance pursued access to the U.K. market through a partnership with an FCA-approved payments provider, Paysafe, in February 2022. *Id.* ¶ 66. The FCA reiterated its concerns about Binance but had limited powers to object to the Paysafe arrangement. *Id.*

"In August 2022, the FCA announced that as of August 11, [2022]," it would "expand[] its change in control regime to include FCA-registered cryptoasset businesses." *Id.* ¶ 57. After August 11, 2022, "a person or entity wishing to acquire 'control' of a FCA-registered cryptoasset business, directly or indirectly, would have to receive prior FCA approval." *Id.* "A 'controller' would mean a person or entity who owns more than 25% of the shares or voting rights in the crypto business." *Id.* This change had been anticipated in the industry since before June of that year. *Id.* ¶ 58.

### 3. The Strategic Partnership

On March 7, 2022, Eqonex announced that it entered into a strategic partnership with Bifinity (the "Strategic Partnership"). *Id.* ¶ 6. Pursuant to the terms of the Strategic Partnership, Bifinity offered Eqonex a $36 million convertible loan facility (the "Loan Agreement"). *Id.* ¶ 7. In return, Bifinity received the right to appoint the CEO, CFO, and Chief Legal Officer ("CLO") of

Eqonex as well as the right to nominate two members to Eqonex's board of directors. *Id.* Bifinity also received "over 24.9% of the shares of Digivault." *Id.* ¶ 8.

On March 17, 2022, Bifinity appointed Farnell to serve as Eqonex's CEO and as a director on Eqonex's board. *Id.* ¶ 28. That same day, Bifinity appointed Hai to serve as a director on Eqonex's board. *Id.* ¶ 31. After she resigned from Eqonex's board on April 28, 2022, Bifinity appointed Ling to serve both as Eqonex's CFO and as a director on Eqonex's board. *Id.* ¶¶ 29, 31. On March 31, 2022, Bifinity appointed Cemmell to be Eqonex's CCAO. *Id.* ¶ 30.

### 4. The March Press Releases

On March 7, 2022, Eqonex issued a press release announcing the Strategic Partnership (the "March 7 Press Release").[3] *Id.* ¶ 47. The March 7 Press Release "touted that the companies would

---

[3] The March 7 Press Release read in full as follows:

> SINGAPORE – March 7, 2022 – EQONEX Limited (NASDAQ: EQOS) ("EQONEX" or the "Company"), a digital assets financial services company, today announced that it has entered into a strategic partnership with Bifinity UAB ("Bifinity"), a payments technology company that is part of the wider Binance Group and the official fiat-to-crypto payments provider for Binance, the world's leading blockchain ecosystem and cryptocurrency infrastructure provider.
>
> Bifinity was established in 2021 but officially launched to the market today and has been powering Binance's fiat-to-crypto on and off ramps, processing millions in transactions globally for Binance.com users. Bifinity's leading payment infrastructure connects traditional finance to world-leading and emerging blockchains, transforming how businesses and people send and receive money around the world. Bifinity is registered with the Registry of Legal Entities of the Republic of Lithuania as a crypto wallet service provider.
>
> Built with a focus on regulation, security and compliance best-practice, EQONEX was the first digital asset firm with an exchange to be publicly listed in the U.S. EQONEX offers regulatory-focused trading services centered around the EQONEX crypto exchange, institutional-grade digital asset investment solutions including an asset manager together with the pending launch of exchange traded products and structured products, and Digivault, an FCA-regulated high security crypto and digital asset custody solution.
>
> Under the terms of the strategic partnership, Bifinity will advance a US$36 million convertible loan to EQONEX and will work together to maximize business synergies created by this new strategic relationship and capitalize on opportunities to cooperate and further expand their businesses. In addition, Bifinity will have the right to appoint, from within Bifinity, the Chief Executive Officer, Chief Financial Officer, and Chief Legal Officer of EQONEX as well as nominate two seats on EQONEX's Board of Directors. Both companies will continue to engage in non-binding discussions to explore potential merger opportunities, subject to regulatory approval.
>
> The strategic partnership will initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting EQONEX Exchange, and expanding Bifinity's geographical footprint through EQONEX's licensing framework. Both parties will also explore opportunities to grow EQONEX's digital asset investment solutions business.
>
> Chi-Won Yoon, Chairman of EQONEX said today, "We are extremely pleased to team up with Bifinity in a partnership that is likely to be transformational for both companies and for the industry at large. Bifinity shares our strong belief in helping to bridge the world of traditional finance

'work together to maximize business synergies created by this new strategic relationship and

capitalize on opportunities to cooperate and further expand their business.'" *Id.* Specifically, the

---

with cryptocurrencies, as well as our conviction to operate to the highest standards of investor protection, regulatory oversight, security and governance."

"This transaction marks the next logical step in our company's evolution, representing an important opportunity to grow our footprint and expand our regulated offerings for the benefit of our customers and shareholders."

"Bifinity's cutting-edge technology and extensive experience in building, operating, and marketing digital platforms and products will help drive the growth and scale of our ecosystem, starting with Digivault, our custody solution, our asset management business and institutionally-focused products on the exchange."

"I look forward to working closely with the Bifinity team to scale up our platform and drive long-term sustainable growth."

Helen Hai, President of Bifinity, commented, "It is with great excitement and enthusiasm that we enter this partnership with EQONEX. EQONEX has a unique value proposition and positioning that we are deeply aligned with. EQONEX has already made significant progress in building out the foundational regulated infrastructure for its ecosystem. Their institutional approach and ability to utilize global regulatory frameworks to build a compliant business directly complements our retail focus and will greatly benefit Bifinity over the long-term."

**Transaction Details**

Under the terms of the strategic partnership which has been approved by the Boards of EQONEX and Bifinity, Bifinity has issued EQONEX a US$36 million convertible loan facility with an 18-month maturity from each drawdown date. The initial conversion price is US$1.89 per share, set with reference to the 50-day average closing-price of EQONEX shares immediately prior to the date of the Loan Agreement.

**About EQONEX**

EQONEX Limited (NASDAQ: EQOS) is a technology driven digital assets financial services group that provides institutional grade infrastructure and a full suite of trading, custody and asset management solutions to clients. The Group's digital assets ecosystem has been designed to accommodate the needs of institutions and individuals with the same degree of regulatory oversight and security they are accustomed to in traditional financial markets. EQONEX's ecosystem primarily encompasses EQONEX Exchange, a digital asset exchange; Digivault, a FCA accredited hot and cold digital assets custodian and Bletchley Park Asset Management, a fund of crypto-hedge funds.

For more information visit: https://group.eqonex.com/

Follow EQONEX on social media on Twitter @eqonex, on Facebook @eqonex, and on LinkedIn.

**About Bifinity**

Bifinity, powered by Binance, is a payments technology company that provides an entry point to the new world of digital currency for businesses. It offers on-and-off-ramp solutions to empower businesses to convert fiat-to-crypto transactions using major payment methods directly.

For more information, visit: https://www.bifinity.com/.

**Forward-Looking Information**

Any forward-looking statements in this press release are based on available current market material and management's expectations, beliefs and forecasts concerning future events impacting EQONEX. You are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, as well as assumptions, which, if they were to ever materialize or prove incorrect, could cause the results of EQONEX to differ materially from those expressed or implied by such forward-looking statements. The forward-looking statements made in this press release speak only as of the date hereof and we disclaim any obligation, except as required by law, to provide updates, revisions or amendments to any forward-looking statements to reflect changes in our expectations or future events.

Dkt. No. 48-6.

March 7 Press Release stated that the Strategic Partnership would "initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the EQONEX Exchange, and expanding Bifinity's geographical footprint through EQONEX's licensing framework." *Id.* ¶ 48. It also told investors that the two companies would "continue to engage in non-binding discussions to explore potential merger opportunities, subject to regulatory approval." *Id.*

Defendant Hai—then president of Bifinity—was quoted in the March 7 Press Release as saying that Eqonex's "institutional approach and ability to utilize global regulatory frameworks to build a compliant business directly complements our retail focus and will greatly benefit Bifinity over the long-term." *Id.* On this news, Eqonex's share price increased 22 percent between March 4 and March 9. *Id.* ¶ 51.

On March 7, 2022, the FCA "issued a statement . . . expressing concern" about the partnership between Eqonex and Bifinity. *Id.* ¶ 52. But, as with the Paysafe arrangement that preceded it, the FCA's hands were tied. The FCA stated that it "did not have powers to assess the fitness and propriety of the new beneficial owners or the change in control." *Id.* The FCA nonetheless reiterated its concerns about the difficulty of effectively supervising Binance. *Id.*

On March 17, 2022, Eqonex issued another press release (the "March 17 Press Release") announcing that it and Bifinity "took the next step in solidifying their strategic partnership" by appointing Farnell and Hai to their new positions at Eqonex.[4] *Id.* ¶ 53. The press release stated, in relevant part:

---

[4] The March 17 Press Release read in full as follows:

    SINGAPORE – March 17, 2022 – EQONEX Limited (NASDAQ: EQOS) ("EQONEX" or the "Company"), a digital assets financial services company, and Bifinity UAB ("Bifinity"), a payments technology company that is part of Binance, took the next step in solidifying their strategic partnership with the appointment of EQONEX's new CEO and two new members to the EQONEX Board of Directors (the "Board").

    Jonathan Farnell, who previously served as Head of Binance UK and CEO of Bifinity, has been appointed as CEO of EQONEX and a director on the Board. Helen Hai, President of Bifinity,

has also been appointed to the Board. Both appointments are effective immediately. The current interim CEO Andrew Eldon will revert back to his primary roles of Chief Operating Officer and interim Chief Marketing Officer.

Under the terms of the strategic partnership announced last week, Bifinity had the right to nominate key appointments, including the CEO and two new Board members. Bifinity will also nominate two additional senior leaders in the coming weeks.

As CEO, Jonathan will play an instrumental role in fast-tracking the collaboration between both businesses. The initial phase of this groundbreaking strategic partnership will put in place a framework for Bifinity to safeguard some of its client assets with EQONEX's FCA registered custodian, Digivault, in compliance with all applicable regulatory requirements. Moving forward, Bifinity will develop ways to leverage the EQONEX Exchange as an alternative trading platform, deploy resources to strengthen the technology, and also explore opportunities to scale the asset management business.

Jonathan is a respected finance and crypto industry leader and most recently held the roles of Head of Binance for the United Kingdom and CEO of Bifinity. With a strong compliance pedigree, Jonathan was involved in developing the company's global regulatory license and registration roadmap, which was crucial for the official launch of Bifinity in early March 2022. Prior to that, Jonathan was Director of Compliance and Board Member of eToro Money, an FCA-regulated payments firm. He also headed operations and sat on the Board at eToroX, the Group's crypto exchange and custody platform.

Helen is President of Bifinity and holds various senior positions within the Binance organization including heading the NFT and fan token platforms and the Binance Charity Foundation. Helen is a respected global leader and a United Nations Industrial Development Organization (UNIDO) Goodwill Ambassador. Helen founded the Made in Africa Initiative that advised African governments on industrialization and investments. She was also the Co-Founder of C&H Garments, which was a pioneer Pan-Africa export-oriented garments manufacturer. She is also a trained actuary with almost 20 years of experience working with FTSE100 companies.

Chi-Won Yoon, EQONEX Chairman said, "We are delighted to welcome Jonathan to the EQONEX management team and Helen to our Board. Their appointments mark the next critical step in developing the Bifinity and EQONEX strategic partnership. I look forward to working with them closely to optimize our businesses and fulfil our joint vision to become a bridge between the old world of traditional finance and cryptocurrencies."

Jonathan Farnell, CEO of EQONEX said, "EQONEX was one of the crypto industry's pioneering firms, leading the sector towards greater regulatory compliance and governance as a listed company. Now as we embark on this groundbreaking industry partnership, it's particularly exciting to join EQONEX as it approaches such an important inflection point in its history."

"We can already see the strengths and capabilities that we can harness between the two companies. EQONEX has an outstanding regulatory and licensing track record and market-leading expertise at identifying opportunities for institutions, which is most clearly evident when looking at the Digivault business that continues to attract institutions and law enforcement agencies. Coupled with its asset management business and exchange, the opportunity to create a full ecosystem by harnessing Bifinity's technology, marketing clout and client base has the potential to be transformative for the industry."

Jonathan added, "EQONEX and Bifinity share the same ethos and vision to help create safe and compliant cryptocurrency ecosystems for consumers and institutions across the world. I'm looking forward to fostering true collaboration and productivity across both businesses across both teams."

As part of these organizational changes, current board members Andrew Eldon, EQONEX Chief Operating Officer and interim Chief Marketing Officer, and Paul Ewing, EQONEX Chief Financial Officer will step down from the EQONEX Board, effective immediately.

**About EQONEX**

EQONEX Limited (NASDAQ: EQOS) is a technology-driven digital assets financial services group that provides institutional-grade infrastructure and a full suite of trading, custody and asset management solutions to clients. The Group's digital assets ecosystem has been designed to accommodate the needs of institutions and individuals with the same degree of regulatory oversight and security they are accustomed to in traditional financial markets. EQONEX's ecosystem primarily

> As CEO, Jonathan will play an instrumental role in fast-tracking the collaboration
> between both businesses. . . .  Moving forward, Bifinity will develop ways to leverage
> the EQONEX Exchange as an alternative trading platform, deploy resources to
> strengthen the technology, and also explore opportunities to scale the asset
> management business.

*Id.*  The March 17 Press Release also quoted Farnell as saying that Eqonex, Digivault, and the

Exchange created an "opportunity to create a full ecosystem by harnessing Bifinity's technology,

marketing clout[,] and client base," which would "[have] the potential to be transformative for the

industry."  *Id.*  He went on to say that he was "looking forward to fostering true collaboration and

productivity across both businesses across both teams."  *Id.*  On this news, Eqonex's share price

increased over 32 percent between March 17 and March 21.  *Id.* ¶ 55.

Plaintiffs allege that "Defendants knew . . . but omitted that the 'collaboration' between

Eqonex and Bifinity was simply an attempted end-run around the FCA's ban on Binance

undertaking any regulated activity in the U.K."  *Id.* ¶ 54.

### 5.  Eqonex's Collapse

On August 15, 2022, Eqonex issued a press release announcing a significant retrenchment in

its business, including the closure of the Exchange, its main source of revenue:

> [Eqonex] is taking decisive action to streamline its operations and focus resources
> primarily on the businesses that offer the most potential for revenue growth and
> long-term financial sustainability:  Asset Management and Custody.  The Company
> will proactively exit the crowded crypto exchange space by closing the Exchange.
>         EQONEX Chairman Chi-Won Yoon recently outlined the Company's
> strategic priorities and intention to focus its resources on businesses where it has
> significant competitive strengths and can leverage its traditional finance expertise and

---

encompasses EQONEX Exchange, a digital asset exchange; Digivault, a FCA accredited hot and cold
digital assets custodian and Bletchley Park Asset Management, a fund of crypto-hedge funds.
        For more information visit: https://group.eqonex.com/
        Follow EQONEX on social media on Twitter @eqonex, on Facebook @eqonex, and on
LinkedIn.
**About Bifinity**
        Bifinity, powered by Binance, is a payments technology company that provides an entry
point to the new world of digital currency for businesses.  It offers on-and-off-ramp solutions to
empower businesses to convert fiat-to-crypto transactions using major payment methods directly.
        For more information, visit: https://www.bifinity.com/.
Dkt. No. 48-7.

experience.  The decision by the EQONEX Board of Directors to accelerate its strategic plan and close the Exchange is in alignment with this strategic framework.

Closing the Exchange will improve the Company's financial position by materially reducing the high-cost structure associated with operating the Exchange, and free up resources to drive growth in the segments where it has significant competitive strengths.

EQONEX CEO Jonathan Farnell said, "We are focused on opportunities that will drive revenue growth and position us for long-term success.  Closing the Exchange will significantly simplify our business, narrow our focus, free up resources, and allow us to operate as a more efficient organization with capacity to aggressively go after market segments that offer the most potential. . . .  We take a realistic view that our exchange will not move the needle for us financially over the near-to- medium term.  We don't see value in continuing to bear the costs of operating an exchange during what may be a prolonged market downturn.  We have conviction that proactively exiting the crowded exchange space is the right decision to deliver shareholder value. . . .  Our Asset Management and Custody business, Digivault, have already made solid progress with the additional resources that we have allocated to them recently, and we are bullish about their prospects as we become an organization focused on these high-potential business areas."

*Id.* ¶ 59.  On this news, Eqonex's share price fell over 18 percent over the next two days.  *Id.* ¶ 60.

On August 15, 2022, "in connection with the closure of the Exchange and in accordance with the Loan Agreement, Bifinity granted Eqonex a waiver for the cessation of a major business and Eqonex agreed to increase Bifinity's share charge of Digivault under the Loan Agreement from 24.9% to 100%."  *Id.* ¶ 12.

On November 21, 2022, Eqonex "disclosed that [it was] in breach of certain provisions of the Loan Agreement and consequently seeking a wavier from Bifinity on such breaches."  *Id.* ¶ 62 (internal quotation marks omitted).  Eqonex stated that its financial resources "may not be sufficient to satisfy the working capital requirements of the [company] for a period of twelve months . . . , which may cast significant doubt on [Eqonex's] ability to continue as a going concern."  *Id.*  On this news, Eqonex's share price fell over 48 percent on November 22, 2022.  *Id.* ¶ 63.  Eqonex was delisted by NASDAQ on November 30, 2022 after its share price fell to $0.093.  *Id.* ¶¶ 16-17.  Eqonex has since filed for bankruptcy.  *Id.* ¶ 25.  Plaintiffs allege that Eqonex was headed for insolvency at the time it entered into the Strategic Partnership.  *Id.* ¶ 3 ("[Eqonex] also lied about the

loan sufficing to stave off Eqonex's insolvency."); *see also id.* ¶ 50 ("Eqonex had no way to repay Bifinity . . . ."); *id.* ¶ 67 ("Eqonex was not in a position to repay.").

### B.  Procedural History

Plaintiffs commenced this action on April 20, 2023.  Dkt. No. 1.  Plaintiffs bring claims against Farnell and Hai under Section 10(b) of the Exchange Act and Rule 10b-5 for making allegedly material misrepresentations and omitting material information about Defendants' intentions regarding the Strategic Partnership.  Am. Compl. ¶ 82.  Plaintiffs also bring claims against Binance, Bifinity, Zhao, Farnell, Ling, Cemmell, and Hai under Section 20(a) of the Exchange Act for exercising their control over Eqonex to induce it to make the material misrepresentations and omissions allegedly contained in the March Press Releases.  *Id.* ¶ 96.  On January 12, 2024, Defendants moved to dismiss for failure to state a claim and lack of personal jurisdiction.  Dkt. Nos. 46, 47, 48.  Plaintiffs filed an opposition to the motion to dismiss on February 16, 2024.  Dkt. No. 49.  Defendants filed their reply on March 4, 2024.  Dkt. Nos. 50, 51.

Defendants initially moved to dismiss all of Plaintiffs' claims arising from all the statements referenced in the Amended Complaint.[5]  Plaintiffs did not oppose all aspects of Defendants' motion. Instead, Plaintiffs limited the scope of their claims in their opposition brief, arguing only that "Defendants made two materially false claims:"  (1) "that the Strategic Partnership would support Eqonex," and (2) "that there was a possibility of a merger between Eqonex and Bifinity."[6]  Dkt. No. 49, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Opp.") at 9.  Plaintiffs thus concede that the Court should dismiss any claims arising from

---

[5] Defendants categorized the statements into three groups:  statements about the loan, statements about the non-binding merger discussions, and statements about the strategic partnership.  Dkt. No. 47, Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Defendant's Support") at 4–5.

[6] Plaintiffs' claims arise exclusively out of the March 7 and March 17 Press Releases issued by Eqonex.  Am. Compl. ¶¶ 47–50, 53–54.

statements that do not relate to whether the Strategic Partnership would benefit Eqonex or to the potential merger.

The main issue for the Court to address is thus whether Plaintiffs have pleaded facts sufficient to allege that Defendants made or induced the March 7 and 17 Press Releases with the knowledge that they did not intend to support Eqonex or to consummate a merger. The Court will address (1) whether Plaintiffs adequately plead that Farnell and Hai "made" the challenged statements for purposes of Section 10(b) liability; (2) whether Plaintiffs adequately plead the falsity of the challenged statements; (3) whether Plaintiffs adequately plead that Defendants or Eqonex knew that they did not intend to support Eqonex or consummate a merger when the statements were made; (4) whether Plaintiffs adequately plead that, if a violation of Section 10(b) were found, Defendants "controlled" the makers of the material misrepresentations, subjecting them to Section 20(a) liability; and (5) whether Plaintiffs' pleadings establish that the Court has personal jurisdiction over Defendants. Because the Court finds that Plaintiffs' pleadings fail to state a claim on these issues, the Court refrains from addressing loss causation.

## III.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

12

Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. *See* Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). However, the Court can consider them "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (alteration in original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

## IV. DISCUSSION

### A. Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v.*

*Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Plaintiffs assert Section 10(b) claims against Farnell and Hai. Even though Eqonex is no longer a defendant, Plaintiffs also assert that Eqonex is likewise a "primary violator" of Section 10(b) for purposes of Plaintiffs' Section 20(a) control-person liability claims.[7] Defendants move to dismiss under Rule 12(b)(6) on the grounds that Plaintiffs have failed to adequately plead (1) that Farnell and Hai made any of the statements Plaintiffs challenge; (2) that the challenged statements were false or misleading or constituted false or misleading omissions; and (3) that Defendants or Eqonex had the requisite scienter.

### 1. Farnell and Hai Are 'Makers' of Only Their Quoted Statements

Farnell and Hai "made" only the statements in the March 7 and March 17 Press Releases that are attributed to them, not the remainder of the statements in the Press Releases because Plaintiffs fail to allege that either Farnell or Hai had ultimate authority over these other statements.

In order to be liable for a violation of Section 10(b), a defendant must have "made" the allegedly material misstatements. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "Make" means "to state," not "to create." *Id.* at 142, 144–45. "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142; *see also id.* at 144 ("Without [ultimate] authority, it is not necessary or inevitable that any falsehood will be contained in the statement"). By contrast, "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.* at 142.

---

[7] *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) ("[T]here is no requirement in the language of [Section 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 486 n.203 (S.D.N.Y. 2010) ("So long as the Complaint adequately alleges the elements of a Rule 10b-5 claim against Canadian Superior as a corporation, it is of no moment that Canadian Superior is not a named defendant due to bankruptcy.").

"In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) (holding that "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577 n.14 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("The only statements for which the [complaint] alleges [the company's founder and director] was the 'maker' are those contained in the [filing] that [he] signed . . . . [He] thus cannot be found liable for any other statements, because there are no particularized allegations that he had any role in shaping their content."). "[I]n the ordinary case, attribution . . . is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus*, 564 U.S. at 142–43.

While explicit attribution can be a strong indication of *Janus*'s "ultimate authority," it also can be found if "implicit from surrounding circumstances," or, in other words, evidenced by various indicia of control. *See City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (quoting *Janus*, 564 U.S. at 142–43); *see also In Re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 261–62 (S.D.N.Y. 2020) ("Whether the defendant is the 'maker' of the misstatement may depend on inferential or circumstantial evidence."); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 473–74 (S.D.N.Y. 2015) (finding "ultimate authority" where defendants owned overwhelming majority of company shares; defendants' employees formed a majority of the company's board; defendants decided whether to sell the company; defendants' employees allegedly negotiated the agreement at issue; and one of defendants' executives signed the agreement at issue); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp.

2d 262, 271 (S.D.N.Y. 2012) (finding "ultimate authority" where defendant vetted and approved documents containing omissions and misstatements and where it filed those documents with the SEC).

Plaintiffs adequately plead that Farnell and Hai were the 'makers' of the statements in the March 7 and 17 Press Releases that were attributed to them. The March 7 Press Release stated, "Helen Hai, President of Bifinity, commented . . . ." Dkt. No. 48-6. The March 17 Press Release read, "Jonthan Farnell, CEO of EQONEX said . . . ," and "Jonathan added . . . ." Dkt. No. 48-7. The statements immediately following these phrases are directly attributed to the defendants, which is "strong evidence" that they had ultimate authority over and thus "made" the statements. *Janus*, 564 U.S. at 142–43. Therefore, Plaintiffs adequately plead that Farnell and Hai are the 'makers' of these quoted statements for purposes of Section 10(b) liability.

However, Plaintiffs did not adequately plead that either Farnell or Hai made the other statements contained in the March 7 Press Release. Farnell and Hai were not appointed to their positions at Eqonex until March 17. Am. Compl. ¶¶ 28, 31. Plaintiffs fail to allege facts indicating that they had ultimate authority over the statements made in a press release issued by Eqonex ten days before they assumed their positions at the company. *Id.* ¶¶ 47, 53. Plaintiffs do not allege that either Farnell or Hai "signed, ratified, or approved the press release" or that the press release as a whole was attributed to either of them. *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 360 (S.D.N.Y. 2022) (Woods, J.). As a result, Farnell and Hai cannot be deemed 'makers' of the non-attributed statements in Eqonex's March 7 Press Release based on Plaintiffs' pleadings.

Plaintiffs similarly fail to plead that either Farnell or Hai made the non-attributed statements in the March 17 Press Release. Farnell and Hai allegedly assumed their positions at Eqonex that very day. Am. Compl. ¶¶ 28, 31. However, the pleadings still lack any allegation that either Farnell or Hai had authority over the press release. Plaintiffs fail to allege facts showing that Hai, as a new

member of Eqonex's board of directors, "had any role in shaping [the press release's] content." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.14 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (holding that the company's founder and director was not a maker, absent "particularized allegations that he had any role in shaping [the statements'] content").

Likewise, Plaintiffs fail to plead facts showing that Farnell, as Eqonex's newly appointed CEO, was involved in publishing, ratifying, or approving the March 17 Press Release. Further, Farnell did not sign the press release; to the contrary, the only person to sign both the March 7 and March 17 Press Releases was CFO and *outgoing* director, Paul Ewing. Dkt. Nos. 48-6, 48-7. The fact that Farnell was quoted in the press release does not itself establish his authority over it without other "indicia of control." *Xu*, 624 F. Supp. 3d at 360–61 (finding "ultimate authority" over a press release where pleadings show that the CEO was also a co-founder; had significant share-ownership and voting power; had broad decision-making authority over the matters at issue; and made lengthy and detailed statements discussing the matters at issue in the press release evidencing his control over the remainder of the release's statements); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 138–39 (S.D.N.Y. 2021) (holding that being quoted in a statement "does not establish [one's] involvement in the creation of the filing"). Contrary to Plaintiffs' suggestion, it is insufficient simply to plead that "as a result of [his] position[] as CEO," he controlled the press release's content. *Xu*, 624 F. Supp. 3d at 360, 362.

For these reasons, Plaintiffs fail to allege that Farnell and Hai were 'makers' of the non-attributed statements in Eqonex's March 7 or 17 Press Releases, but Plaintiffs have adequately alleged that Farnell and Hai 'made' their quoted statements in the Press Releases.

### 2. Plaintiffs Fail to Plead that Hai's Statement Is False or Misleading

Plaintiffs fail to allege any facts that would indicate that Hai's quoted statement in the March 7 Press Release was false or misleading. "A statement is misleading if a reasonable investor would

have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted). When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)). And "literally true statements" are actionable if they "create a materially misleading impression." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).

Hai was quoted in the March 7 Press Release as saying that Eqonex's "institutional approach and ability to utilize global regulatory frameworks to build a compliant business directly complements our retail focus and will greatly benefit Bifinity over the long-term." Am. Compl. ¶ 48. Plaintiffs fail to allege that this statement was false or misleading.[8] The statement refers only to the potential benefits of the Strategic Partnership for *Bifinity*. It does not say anything about whether the Strategic Partnership would benefit *Eqonex* or about a potential merger. Thus, no reasonable investor could have received the impression that the Strategic Partnership would support Eqonex or that the two companies would pursue a merger, which are the two allegedly false claims on which Plaintiffs base their allegations of fraud. *See* Plaintiffs' Opp. at 9. Hai's March 7 statement is thus not materially false or misleading.

---

[8] To the contrary, Plaintiffs allege that the Strategic Partnership was intended primarily to benefit Bifinity, as Bifinity would gain access to the regulated U.K. market, in which Eqonex was approved to do business. Am. Compl. ¶¶ 10, 50. Thus, the Amended Complaint actually alleges that Hai's statement is true: Defendants' hoped that Eqonex's ability to utilize global regulatory frameworks would benefit Bifinity over the long term.

### 3.  Plaintiffs Fail to Adequately Allege Defendants' Scienter

Plaintiffs fail to adequately allege that either Farnell, Hai, or any other Eqonex officer had actual knowledge that the Strategic Partnership was not meant to support Eqonex or that there was no intention for Bifinity and Eqonex to merge.

### a.  Legal Standard

Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23.

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010). An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy

even a relaxed standard.'" *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325). In sum, "[t]he inquiry on a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

Further, rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281–82 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (citation omitted) (quoting 15 U.S.C. § 78u-4(b)(2))).

### b. The Challenged Statements are Forward-Looking and Puffery

The statements attributed to Farnell and the challenged statements in the March 7 and March 17 Press Releases are forward-looking or constitute corporate puffery, and consequently, Plaintiffs must prove actual knowledge of their falsity to state a claim under Section 10(b).

The PSLRA defines forward-looking statements as, among others, statements of "the plans and objectives of management for future operations" and statements of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(B)–(C). To plead scienter for a forward-looking statement, a

plaintiff must allege that the statement was made "with actual knowledge" of its falsity.  15 U.S.C.

§ 78u-5(c)(1)(B); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("[T]he scienter

requirement for forward-looking statements is stricter than for statements of current fact.  Whereas

liability for the latter requires a showing of either knowing falsity or recklessness, liability for the

former attaches only upon proof of knowing falsity.").  If the alleged violator is a business entity, a

plaintiff must prove that the forward-looking statement was "made by or with the approval of an

officer of that entity . . . with actual knowledge by that officer that the statement was false or

misleading."  *Id.* § 78u-5(c)(1)(B)(ii).

> Likewise, statements of optimism and puffery can be actionable only where they "contradict

facts that are *known* to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537

(S.D.N.Y. 2016) (emphasis added), or where they amount to "'misrepresentations of existing facts'

that were made even though the speaker '*knew*' that the contrary was true,'" *Galestan v. OneMain*

*Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (emphasis added) (quoting *Novak v. Kasaks*,

216 F.3d 300, 315 (2d Cir. 2000)).  "Puffery encompasses 'statements that are too general to cause a

reasonable investor to rely upon them.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir.

2016) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187,

206 (2d Cir. 2009)).  "General statements of optimism and puffery are non-actionable under federal

securities laws because they are not 'sufficiently specific that a reasonable investor could rely on

[them] as a guarantee of some concrete fact or outcome.'"  *Saskatchewan Healthcare Emp.'s Pension Plan*

*v. KE Holdings Inc.*, 2024 WL 775195, at *20 (S.D.N.Y. Feb. 26, 2024) (Woods, J.) (quoting *Lopez v.*

*Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016)); *see also In re Vale S.A. Sec. Litig.*,

2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is

'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and

what its 'priorities' are" were non-actionable).

In this case, all the statements that Plaintiffs allege misled investors that the Strategic Partnership would strengthen Eqonex are forward-looking statements and statements of corporate puffery.[9]  The statements asserting that through the Strategic Partnership, the companies "[m]oving forward" "will work together" and "collaborat[e]" to "strengthen" and "leverage" Eqonex and the Exchange, Am. Compl. ¶¶ 47, 48, 53, constitute "the plans and objectives about the companies' management for future operations," 15 U.S.C. § 78u-5(i)(1)(B)–(C).  Furthermore, these statements "tout[ing]" that the businesses would "cooperate" to "maximize business synergies" in a way that would be "transformative for the industry," Am. Compl. ¶¶ 47, 53, are sufficiently vague such that no reasonable investor could rely on them as a guarantee that Eqonex and Bifinity would take some concrete action.

Likewise, all the pleaded statements regarding the companies' intentions to pursue a potential merger are forward-looking statements.[10]  The statement that Eqonex and Bifinity "would continue to engage" in "potential" merger discussions, *id.* ¶ 48, constitute the plans and objectives of corporate management.  *See Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 397–98 (S.D.N.Y. 2001) ("All of Verizon's challenged statements . . . concerning the status of the merger[] are merely expressions of optimism concerning an uncertain future event.").

---

[9] These statements include:  "[The companies will] work together to maximize business synergies created by this new strategic relationship and capitalize on opportunities to cooperate and further expand their business."  Am. Compl. ¶ 47.  "[The Strategic Partnership will] initially focus on leveraging Digivault as an FCA regulated custodian, strengthening the technology supporting the EQONEX Exchange, and expanding Bifinity's geographical footprint through EQONEX's licensing framework."  *Id.* ¶ 48.  "[The companies] took the next step in solidifying their strategic partnership with the appointment of EQONEX's new CEO and two new members to the EQONEX Board of Directors (the "Board")."  *Id.* ¶ 53.  "As CEO, Jonathan will play an instrumental role in fast-tracking the collaboration between both businesses."  *Id.*  "Moving forward, Bifinity will develop ways to leverage the EQONEX Exchange as an alternative trading platform, deploy resources to strengthen the technology, and also explore opportunities to scale the asset management business."  *Id.*  "Coupled with its asset management business and exchange, the opportunity to create a full ecosystem by harnessing Bifinity's technology, marketing clout and client base has the potential to be transformative for the industry."  Dkt. No. 48-7; *see also* Am. Compl. ¶ 53.  "[I'm] looking forward to fostering true collaboration and productivity across both businesses across both teams."  Am. Compl. ¶ 53.

[10] These statements include:  "[The companies will] continue to engage in non-binding discussions to explore potential merger opportunities, subject to regulatory approval."  *Id.* ¶ 48.

Because the challenged statements are all forward-looking or corporate puffery, Plaintiffs must adequately plead that Defendants had "actual knowledge that [the statements were] false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245; *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 537.

### c. Plaintiffs Fail to Adequately Plead Scienter as to Each Section 10(b) Defendant

Plaintiffs' Section 10(b) claims are dismissed because Plaintiffs engage in group pleading and because Plaintiffs fail to allege with particularity facts giving rise to a strong inference that Defendants or any other Eqonex employee had actual knowledge that the Strategic Partnership would not support Eqonex or that Bifinity and Eqonex would never merge.

### i. Plaintiffs Engage in Impermissible Group Pleading

Plaintiffs have failed to adequately allege scienter as to each individual defendant, as is required under the heightened pleading standard of Fed. R. Civ. P. 9(b) and the PSLRA. "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). The Amended Complaint frequently alleges that "Defendants knew" or that "Primary Violators knew." *See* Am. Compl. ¶¶ 34, 50, 54, 83, 85. Plaintiffs fail to even plead each individual Defendant's state of mind, let alone provide "a factual basis" for the allegations. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 at 695. The Amended Complaint thus suffers from textbook group pleading. *See The Pennsylvania Ave. Funds v. Inyx Inc.*, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'Inyx Defendants' is a defined term in the [a]mended [c]omplaint that refers to defendants Kachkar, Handley, Goldschmidt, Green and Inyx, Inc., collectively. This type of 'group pleading' of scienter . . . runs afoul of the PSLRA.").

While Plaintiffs argue that "Defendants' job was to carry out Binance's intentions," which "raises the inference that they knew those intentions," Plaintiffs' Opp. at 18, this allegation is not in

the pleadings, nor does it do anything more than allege "guilt by association." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

Furthermore, Plaintiffs' group pleading undermines their allegation that Eqonex was a primary violator of Section 10(b). The PLSRA requires that Plaintiffs plead that the forward-looking statements were "made by or with the approval of an officer of [Eqonex] . . . with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(ii). Plaintiffs merely plead that "Defendants" knew the March 7 and 17 Press Releases put out by Eqonex were false. Plaintiffs fail to allege which Eqonex officer had actual knowledge of their falsity and whether that officer made or approved the Press Releases. As discussed, Plaintiffs do not allege that Farnell or Hai were involved in 'making' the Press Releases, nor do Plaintiffs adequately allege that Farnell or Hai individually had actual knowledge that the Press Releases were false. Plaintiffs' claim that Eqonex is a primary violator of Section 10(b) therefore does not meet the exception to the PSLRA's safe-harbor provision for forward-looking statements.

### ii. Plaintiffs Fail to Plead Facts Supporting a Strong Inference that Defendants Had Actual Knowledge

Plaintiffs' have failed to plead "with particularity facts giving rise to a strong inference" that at the time of the March Press Releases, Defendants knew (1) that the Strategic Partnership would not support Eqonex or (2) that Eqonex and Bifinity would not merge. 15 U.S.C. § 78u-4(b)(2)(A).

The "three-part prescription for carrying out this inquiry" requires "accept[ing] all factual allegations in the [Amended Complaint] as true," considering "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," then "tak[ing] into account plausible opposing inferences." *Slayton v. American Exp. Co.*, 604 F.3d 758, 774 (2d Cir. 2010).

Plaintiffs' allegations of scienter hinge on the existence of a sinister scheme by Binance, Bifinity, and their executives to use the Strategic Partnership to "let[] Eqonex collapse" and thereby "gain control of Digivault" in order "to re-enter the U.K. market." Plaintiffs' Opp. at 1–2; *see also*

Am. Compl. ¶ 10.  Plaintiffs plead the following facts in support of its allegation that Binance had motive to use the Strategic Partnership to regain access to the U.K. market.  In June 2021, Binance was banned from conducting "all regulated activity in the U.K.."  Am. Compl. ¶ 45.  Binance subsequently "pursued access to U.K. markets in more than one way," including a partnership with an FCA-approved payments provider.  *Id.* ¶ 66.  "Binance and its executives have consistently acted to subvert financial regulators" in China and the United States in the past.  *Id.* ¶¶ 64–65.  In March 2022, Bifinity entered into the Strategic Partnership with Eqonex, which owned an FCA-approved digital asset custodian.  *Id.* ¶ 47.

Plaintiffs plead the following facts in support of its allegation that Defendants expected Eqonex to fail so that they could gain control of Digivault.  Bifinity and the Defendants "knew or recklessly disregarded that Eqonex was not in a position to repay" the Loan.  *Id.* ¶ 67.  Five months after the Strategic Partnership commenced, "Eqonex announced that it planned to exit the crypto exchange space [and] close the [E]xchange," even though "the Exchange account[ed] for 79.9% of Eqonex's revenues" the prior year.  *Id.* ¶ 11.  That same day, "Bifinity granted Eqonex a waiver for the cessation of a major business and Eqonex agreed to increase Bifinity's share charge of Digivault under the loan agreement from 24.9% to 100%. In other words, Bifinity took over Digivault entirely as Eqonex lost the source of nearly 80% of its revenue."  *Id.* ¶ 12.

These facts, taken as true, do not give rise to a strong inference of scienter under the heightened Fed. R. Civ. P. 9(b) and PSLRA standards.  One can reasonably infer a motive for Binance to access the U.K. market from Binance's previous operations in the U.K. and its attempts to form other partnerships after the ban.  However, this motive to access the U.K. market does not equate to a motive to bring down Eqonex.

The remainder of the alleged events fail to provide sufficient circumstantial evidence that Defendants had knowledge of a scheme to cause Eqonex to collapse to allow Binance to take over

Digivault.  Plaintiffs make no allegations that any Defendant took any action to effectuate the collapse of Eqonex.  *See ATSI Comm'cs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007) ("These allegations fail Rule 9(b)'s requirement . . . . [The complaint] fails to allege with particularity what, if anything, the defendants did to cause the decline; it simply offers a generalized allegation that the defendants engaged in death spiral financing.").  Plaintiffs make no allegation that any Defendant or Eqonex executive was made aware of a plan by Binance or Bifinity regarding the Exchange or the potential merger, and Plaintiffs have provided no "factual basis to support" the allegation that Defendants never intended to effectuate a merger.  *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 396 (S.D.N.Y. 2001) ("Plaintiffs have provided no factual basis to support the claim that prior to November 14, 2000, Verizon had changed its mind and decided to terminate the merger.").  All Plaintiffs provide are a series of unfortunate events for Eqonex over a period of five months, which Plaintiffs frame as the consequences of the alleged scheme, and "conclusory" allegations of scienter that border on impermissible conjecture.  *ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."); *see also Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient.").

The Court must also consider "plausible opposing inferences" in order to assess whether Plaintiffs' inferences are "at least as compelling" as the alternatives.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007).  An opposing inference from these set of facts would be that Eqonex was a company facing financial hardship and ultimately failed despite good faith efforts by Bifinity to realize synergies between their platforms.  The fact that Binance pursued other partnerships in the U.K. after its ban on operations, Am. Compl. ¶ 66, supports the inference that Binance was pursuing another good faith partnership with Eqonex in order to access the U.K.

market.  The fact that Bifinity appointed only two directors to Eqonex's seven-person board, *id.* ¶ 7, supports the inference that Bifinity was not in "control" of Eqonex as Plaintiffs claim, *id.* ¶ 3, but rather that Bifinity undertook a partnership.  *See id.*  ¶ 59 ("The decision by the EQONEX *Board of Directors* to accelerate its strategic plan and close the Exchange is in alignment with this strategic framework." (emphasis added)).  Further, Plaintiffs' allegation that "the Loan was not sufficient to stave off Eqonex's insolvency" supports the inference that Eqonex was headed for ruin regardless of the Strategic Partnership.  *Id.* ¶ 10; *see also id.* ¶ 50 ("Eqonex had no way to repay Bifinity . . . ."); *id.* ¶ 59 (quoting Eqonex regarding the "high-cost structure associated with operating the [E]xchange").  Lastly, Plaintiffs allege that by the time Eqonex made the decision to close the Exchange on August 15, 2022, the FCA had announced a rule requiring prior FCA approval whenever a person or entity attempts to "acquire control of a FCA-registered cryptoasset business, directly or indirectly."  *Id.* ¶ 57.  "A controller would mean a person or entity who owns more than 25% of the shares or voting rights in the crypto business."  *Id.*  The Amended Complaint alleges that Bifinity had only a 24.9 percent share charge of Digivault before August 15.  *Id.* ¶ 12.  From these facts, one can reasonably infer that Bifinity would need FCA approval to take over Digivault anyway, which does not support the inference that closing the Exchange was an "attempted end-run around the FCA's ban."  *Id.* ¶ 54.[11]

"While [the Court] find[s] the inference of fraudulent intent plausible, and consider[s] this to be a close case," the circumstantial evidence alleged by Plaintiffs does not lend strong support for

---

[11] Only in their opposition brief do Plaintiffs propose that "Defendants were motivated to keep up the illusion that they were simply in a Strategic Partnership with Eqonex with the possibility of a merger so that they could work on convincing the FCA to sanction a change in control of Digivault, which would then allow them to take a 100% share charge in Digivault and let Eqonex itself collapse."  Plaintiffs' Opp. at 16–17.  These allegations are not made in the Amended Complaint, and "a party is not entitled to amend its complaint through statements made in motion papers."  *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (citing *IIT, an Int'l Inv. Tr. v. Cornfeld*, 619 F.2d 909, 914 n.6 (2d Cir. 1980), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010)).  Nor do these allegations make logical sense.  Defendants would not need a scheme "to circumvent the FCA's ban," Plaintiffs' Opp. at 11, if they ultimately planned simply to convince the FCA to grant them access again.  *See* Dkt. No. 50, Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss at 6.

the inference that Defendants had actual knowledge that Bifinity would let Eqonex fail and would terminate a merger. *Slayton*, 604 F.3d. at 777. Based on the facts alleged, the more compelling inference is that Defendants used the Strategic Partnership to get access to the U.K. market in good faith but were unable to prevent Eqonex's impending collapse. Therefore, the pleadings fail to allege facts sufficient under Fed. R. Civ. P. 9(b) and the PSLRA to draw a strong inference that the March 7 and March 17 Press Releases were made with actual knowledge of their falsity. *Slayton*, 604 F.3d at 777.

### 4.  Loss Causation

Because Plaintiffs' Section 10(b) claims fail as to scienter, the Court need not address Defendants' argument that Plaintiffs have failed to establish loss causation. *See Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *30 (S.D.N.Y. Feb. 26, 2024) (Woods, J.) ("Because the failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim, the Court need not address [d]efendants' other arguments for . . . dismissal.").

### B.  Section 20(a) Liability

Because Plaintiffs fail to adequately plead a violation of Section 10(b) or Rule 10b-5, their Section 20(a) claims also fail. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009). However, even assuming Plaintiffs adequately plead a 10(b) claim by a primary violator, Plaintiffs' 20(a) claims suffer from other deficiencies.

### 1.  Legal Standard

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom

such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010).  To state a claim of control person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

Control person liability requires "actual control" over the primary violator.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015).  "Control in this context is not the mere ability to persuade, but almost always means the practical ability to direct the actions."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (internal quotation marks omitted).  As such, "minority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control under Section 20(a)."  *In re Alstom SA*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) ("If the [three] Verizon designees convinced enough of the other six members of the Board of Directors to allow Flag to enter into unduly speculative ventures to benefit Verizon, it would have been the result of the exercise of their powers of persuasion, not through actual control of Flag."); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015) (dismissing a Section 20(a) claim against a defendant who owned 26 percent of primary violator's stock and had the right to appoint two directors to an eight-person board).

The determination of whether a defendant is a "controlling person" is "a fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *Id.* at 741 (citation and alteration omitted). Nonetheless, "it is not sufficient for [a plaintiff] to allege that [a defendant] has control person *status*; instead, [the plaintiff] must assert that [the defendant] exercised *actual* control over the matters at issue." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166–67 (S.D.N.Y. 2012) (holding that even though the defendant "was provided with or had unlimited access to copies of the [violating company's] public filings," the pleadings were insufficient for failing to allege the defendant "signed, drafted, approved, or confirmed a misleading statement"); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008). Additionally, this Court previously held that an entity's "status as a corporate parent [] says nothing regarding the control that [it] exerts." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460 (S.D.N.Y. 2018) (Woods, J.). In that case, the plaintiffs' allegation that a parent company "acted as a controlling person . . . and had the power and authority to cause [the primary violator] to engage in the wrongful conduct" was "nothing more than a conclusory allegation of control." *Id.* at 461.

### 2. Plaintiffs Fail to Adequately Allege Control Liability Claims Against Binance and Zhao

Because Plaintiffs' Section 20(a) claims against Binance and Zhao rest solely on their status as parent company and owner of the parent company, respectively, Plaintiffs fail to adequately plead Binance and Zhao's control.

Plaintiffs allege broadly that "the [S]trategic [P]artnership put Bifinity (and, through Bifinity, Binance) in control of Eqonex by taking over its executive management." Am. Compl. ¶ 7. Plaintiffs implicitly allege that Zhao thereafter also controlled Eqonex because "Bifinity is wholly controlled by [Zhao], its sole shareholder." *Id.* ¶ 6. Plaintiffs fail to plead any allegations that either Binance or Zhao exercised control over anyone at Bifinity or Eqonex, let alone about any of the March 7 and 17 Press Releases. *See In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[A]

Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." (internal quotation marks omitted)). Plaintiffs only assert that "Bifinity is part of Binance" and Zhao is Bifinity's sole shareholder. Am. Compl. ¶ 44, 32. On this basis alone, Plaintiffs conclude that these Defendants are "controller[s] of Eqonex" with the "power to direct the actions of . . . Eqonex to engage in the unlawful acts." *Id.* ¶ 95. This is "nothing more than a conclusory allegation of control." *DoubleLine*, 323 F. Supp. 3d at 461.

Thus, even if Plaintiffs adequately alleged a primary violation of Section 10(b), Plaintiffs have failed to state Section 20(a) control-person claims against Binance and Zhao.

### 3. Plaintiffs Fail to Adequately Allege Control Liability Claims Against Ling and Cemmell

The Section 20(a) claims against Ling and Cemmell should also be dismissed regardless of the existence of a primary violation because Plaintiffs fail to plead facts supporting their control over any person involved in producing the March 7 and 17 Press Releases. The Amended Complaint refers to Ling and Cemmell by name only when explaining that Bifinity appointed Ling as a director and CFO and Cemmell as CCAO for Eqonex. Am. Compl. ¶ 29–30. Plaintiffs fail to plead specific allegations regarding Ling's or Cemmell's control over any person involved in making the allegedly false statements. In fact, Ling was not appointed to Eqonex as an officer or director until April 28, 2022, over a month after the allegedly false statements were made. Am. Compl. ¶ 29. Likewise, Cemmell was appointed on March 31, 2022, well after the March Press Releases were published. *Id.* ¶ 30. Plaintiffs fail to plead that Ling or Cemmell had control prior to their assumption of their positions at Eqonex.

Thus, Plaintiffs instead argue in their opposition brief that "[t]he precise dates of their official appointments to Eqonex are irrelevant" because the Strategic Partnership had already "established Bifinity's control of the Company." Plaintiffs' Opp. at 21. By that point, Plaintiffs claim, "Eqonex could no longer act without Bifinity's direction or approval, which would inevitably

mean the direction or approval of Bifinity's CEO (Defendant Farnell), Director of Strategy (Defendant Ling), Special Projects Lead (Defendant Cemmell), and President (Defendant Hai)." *Id.* However, the pleadings do not allege with particularity that these Bifinity officers exercised any control over Eqonex employees related to the March Press Releases. Plaintiffs again rely on group pleading without particularity. Plaintiffs' have failed to allege that Ling or Cemmell had actual control over the statements at issue and therefore fail to state a claim for control-person liability.

### 4. Plaintiffs Fail to Adequately Allege Control Liability Claims Against Farnell and Hai

Likewise, Plaintiffs fail to allege Farnell's and Hai's control over anyone involved with the March 7 and 17 Press Releases with any particularity. Unlike Ling and Cemmell, Farnell and Hai were directors (and Farnell was CEO) at the time of the March 17 Press Release, so Plaintiffs allege that "[b]ecause of their positions of control and authority as senior officers and controllers of Eqonex, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Eqonex disseminated in the marketplace." Am. Compl. ¶ 94. Plaintiffs go on to cite "their senior management positions" and director positions as evidence of their "power to direct the actions" complained of. *Id.* ¶ 95. These appeals to Farnell's and Hai's controlling person *status* alone are insufficient to allege Section 20(a) liability. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) ("[I]t is not sufficient for [p]laintiffs to allege that [defendant] has control person *status;* instead, [p]laintiffs must assert that [defendant] exercised *actual* control over the matters at issue."). Even though Defendants had control over various reports and press releases per their positions, Plaintiffs "fail[] to allege [Defendants] signed, drafted, approved, or confirmed a misleading statement." *Id.* at 166–67; *see also In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002) ("It is well accepted that merely alleging that a particular defendant is a director or an officer of a company is not sufficient to allege control.").

The Section 20(a) claims against Farnell and Hai thus fail.

### 5. Plaintiffs Fail to Adequately Allege a Control Liability Claim Against Bifinity

Because Plaintiffs fail to adequately allege control by any of the Bifinity-appointed officers and directors, Plaintiffs' allegations of control liability against Bifinity also fail. Plaintiffs allege that Bifinity exercised "control of [Eqonex]" because "[t]he Strategic Partnership granted Bifinity full control over Eqonex's executive management, as well as two seats on its [b]oard." Plaintiffs' Opp. at 21. However, Plaintiffs fail to allege through which managers or directors Bifinity controlled the March Press Releases. The fact that Bifinity appointed two seats on a seven-person board of directors is not, itself, enough to allege that Bifinity exercised "actual control" over Eqonex or the Press Releases. *See In re Alstom SA*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005) ("[T]he ability to appoint a minority of the board do[es] not create power to direct management and policies, and thus do[es] not constitute sufficient control under Section 20(a)."). Additionally, as discussed above, Plaintiffs fail to plead that the officer Defendants under Bifinity's "control" exercised actual control over the Press Releases. Thus, Plaintiffs fail to plead with particularity that Bifinity actually exerted control over "the matters at issue." *See In re Smith Barney*, 884 F. Supp. 2d at 166. Thus, the Section 20(a) claim against Bifinity fails.

### C. Personal Jurisdiction

The Amended Complaint establishes the Court's personal jurisdiction over Farnell and Hai because it alleges that they made misleading statements directed at investors in the United States. However, because they rely on group pleading and conclusory allegations, Plaintiffs fail to plead the other defendants' involvement in the alleged fraud sufficient to satisfy the minimum contacts requirement.

### 1. Legal Standard

In determining whether it may exercise personal jurisdiction over a defendant, the Court must conduct a two-step inquiry. First, the Court must determine whether there is a "statutory basis

for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013)

(citation omitted).  A federal court applies the forum state's personal jurisdiction rules unless a

federal statute "specifically provide[s] for national service of process." *Brown v. Lockheed Martin Corp.*,

814 F.3d 619, 624 (2d Cir. 2016) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.

1997)).  Second, the Court must determine whether the exercise of personal jurisdiction over the

defendant would comport with due process under the Constitution.  *Licci ex rel. Licci v. Lebanese

Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012).

The statutory basis for personal jurisdiction in securities cases involving securities listed on

domestic exchanges is found in Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which "permits

the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth

Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Leasco Data

Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972), *abrogated on other grounds by

Morrison v. Nat'l Aust. Bank Ltd.*, 561 U.S. 247 (2010); *see also S.E.C. v. Straub*, 921 F. Supp. 2d 244,

252 (S.D.N.Y. 2013) ("In securities cases like this one involving securities listed on domestic

exchanges, Section 27 . . . establishes the exclusive basis for personal jurisdiction."); 15 U.S.C. §§

77v, 78aa (providing for worldwide service of process).  Thus, the sole question here is whether due

process permits the exercise of jurisdiction over Defendants.

Due process requires that if a defendant is "not present within the territory of the forum, he

[must] have certain minimum contacts with it such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945) (citation omitted).  The analysis consists of two components:  the "minimum contacts"

analysis and the "reasonableness" inquiry.  *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567

(2d Cir. 1996) (citations omitted).

To establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, the plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citation omitted). Although foreseeability is a component of the minimum contacts analysis, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). Because the Exchange Act authorizes worldwide service of process, the relevant contacts for purposes of the "minimum contacts" analysis are those with the United States as a whole. *See, e.g.*, *Straub*, 921 F. Supp. 2d at 253 ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." (quoting *SEC v. Morton*, No. 10–cv–1720 (LAK)(MHD), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011), *adopted*, *id.*, ECF No. 102, 2011 WL 11768504 (S.D.N.Y. Nov. 3, 2011)); *see In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207 (2d Cir. 2003) (discussing analogous service of process provision in the Clayton Act); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) (stating that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States"); *accord In re Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1294 (7th Cir. 1992) ("When the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation. [T]he due process clause requires only that the defendant possess sufficient contacts with the United States.").

"The second part of the jurisdictional analysis asks whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted). If the defendant's contacts with the forum rise to the level of "minimum contacts," a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). In determining whether the exercise of personal jurisdiction over a particular defendant would be reasonable, the court must evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113–14 (1987)).

Courts have found personal jurisdiction to exist where "an executive of a foreign securities issuer, wherever located, participates in a fraud *directed to* deceiving United States shareholders." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 769 (S.D.N.Y. 2017) (quoting *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 256–57 (S.D.N.Y. 2013)); *see also J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."). "[I]t is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies this test." *U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013).

However, "conclusory allegations of participation in the fraud are insufficient" to establish personal jurisdiction. *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), *aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) ("[A]ny allegations that Mogren or Barnevik caused the distribution of false and misleading reports and statements to AstraZeneca investors in the U.S. or that they had actual knowledge that each of the representations alleged herein were materially false or misleading are merely conclusory statements applicable to all individual defendants as a result of their positions within the Company."). *See also In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 731, 770 (S.D.N.Y. 2017) (holding that the allegation that "Odebrecht had the power to influence and control and did influence and control . . . the Company, including the dissemination of the various statements and omissions" is "not enough to support personal jurisdiction"); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 136–37 (S.D.N.Y. 2021) (holding that specific jurisdiction is not established merely because the "defendant exercised control over the company because he had a majority of voting share capital, veto power over corporate actions, the ability to appoint officers and Board members, and power to approve the business plan").

Moreover, "[t]o allege personal jurisdiction over a defendant, group pleading is not permitted. *In re Aegean*, 529 F. Supp. 3d at 135. "A plaintiff must carry his burden with respect to each defendant individually." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021) (collecting cases).

### 2. Application

The Amended Complaint sufficiently pleads the Court's personal jurisdiction over Farnell and Hai. Plaintiffs plead that Farnell and Hai individually made false statements in press releases to United States investors, Am. Compl. ¶¶ 48, 53, 72, conduct "designed to violate United States securities regulations" and "necessarily directed toward the United States." *S.E.C. v. Straub*, 921 F.

Supp. 2d 244, 255 (S.D.N.Y. 2013). While the Court has found that the allegations of falsity and scienter are insufficient to establish liability under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, the pleadings do constitute an allegation of participation in fraud directed at the United States and therefore establish personal jurisdiction over Farnell and Hai. *See Sharef*, 924 F. Supp. 2d at 547; *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 644 (S.D.N.Y. 2017) (Woods, J.) ("Plaintiff has adequately alleged that [the defendant] signed off on the press release with knowledge that it would be filed with the SEC and be given to prospective American purchasers . . . , and that is enough to establish minimum contacts with the United States.").

As for the other defendants, the Amended Complaint fails to establish personal jurisdiction because it relies on group pleading and conclusory allegations of control. Plaintiffs fail to allege with particularity that Bifinity, Binance, or Zhao had any actual control over the allegedly false or misleading statements; Plaintiffs simply allege that they had control by nature of their positions, which is insufficient to confer personal jurisdiction. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 770 (holding that simply alleging control status is insufficient for establishing personal jurisdiction); *In re Aegean*, 529 F. Supp. 3d at 136–137 (holding it insufficient for personal jurisdiction merely to allege "the ability to appoint officers and Board members"). Likewise, Plaintiffs fail to allege that Ling or Cemmell had any control over Eqonex or its employees at the time of the March Press Releases, before they even assumed their positions at Eqonex. Therefore, Plaintiffs have failed to allege their "participation in the fraud." *In re AstraZeneca*, 559 F. Supp. 2d at 467. As currently pleaded, Plaintiffs' Amended Complaint does not sufficiently establish that Bifinity, Binance, Zhao, Ling, or Cemmell had minimum contacts related to Plaintiffs' claims of fraud against United States investors because Plaintiffs fail to plead, with particularity and on an individual basis, facts establishing their involvement in the alleged fraud.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

Plaintiffs have failed to plead a primary violation of Section 10(b) of the Exchange Act by Defendants Farnell and Hai or by Eqonex. Plaintiffs have separately failed to plead Section 20(a) control-person claims against all Defendants.

Because the Court cannot conclude that further amendment of the complaint would be futile, the Court grants Plaintiffs leave to file a second amended complaint solely to cure the deficiencies identified in this opinion no later than 30 days from the date of this order. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

The Clerk of Court is directed to terminate the motion pending at ECF No. 46.

SO ORDERED.

Dated:  September 18, 2024
        New York, New York

_____
GREGORY H. WOODS
United States District Judge